# ATTACHMENT 6

# Unreported Cases
# (In Alphabetical Order)

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 2 of
Case 1:13-cv-01901-JOF   Document 18-7   Filed 07/03/13   Page 2 of 41
Askue v. Aurora Corp. of America, Not Reported in F.Supp.2d (2012)

2012 WL 843939
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia,
Atlanta Division.

Braden ASKUE and Lisa Askue, individually
and as parents and natural guardians
of Abigail Askue, a minor, Plaintiffs,

v.

AURORA CORPORATION OF AMERICA,
Aurora Office Equipment Co., Ltd., and
Michilin Prosperity Co., Ltd., Defendants.

Civil Action No. 1:10–cv–
0948–JEC.   |   March 12, 2012.

**Attorneys and Law Firms**

T. Stephen McConnell, Robert Marvin Sneed, Jr., Mcconnell, Sneed & Cohen LLC, Atlanta, GA, for Plaintiffs.

Kenan G. Loomis, Alycen A. Moss, Cozen & O'Connor, Atlanta, GA, for Defendants.

Opinion

### ORDER AND OPINION

JULIE E. CARNES, Chief Judge.

**\*1** This case is before the Court on defendant Michilin Prosperity Co ., Ltd.'s Motion to Dismiss [44].[1] The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendant's Motion to Dismiss [44] should be **GRANTED.**

### BACKGROUND

This is a products liability action involving a paper shredder manufactured by defendant Michilin Prosperity Co., Ltd. ("Michilin") and sold to the Aurora defendants (hereinafter "Aurora"), who distributed the shredder under their name. Plaintiffs, on behalf of their minor daughter, allege that this Aurora AS1000X 10CC cross-cut paper shredder mutilated their daughter's right hand. (2d Am. Compl. [17] at ¶¶ 6–11.) They bring claims, under Georgia law, against defendant

Michilin and Aurora for strict liability, breach of warranty, negligence, loss of consortium, and punitive damages.

Defendant Michilin, a Taiwanese corporation with its principal place of business in Taiwan, has moved to dismiss for lack of personal jurisdiction. Briefing on this motion concluded on August 17, 2011, and the motion is before the Court for resolution.

### DISCUSSION

#### I. APPLICABLE LAW

On a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff has the burden of establishing a prima facie case of jurisdiction. *See Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino,* 447 F.3d 1357, 1360 (11th Cir.2006); *Oldfield v. Pueblo de Bahia Lora, S.A .,* 558 F.3d 1210 (11th Cir.2009). "A prima facie case is established if the plaintiff presents enough evidence to withstand a motion for directed verdict." *Madara v. Hall,* 916 F.2d 1510, 1514 (11th Cir.1990).

In evaluating plaintiff's case, the district court must accept as true the allegations in the complaint. *Stubbs,* 447 F.3d at 1360. Where the defendant contests the allegations of the complaint through affidavits, "the burden shifts back to the plaintiff to produce evidence supporting personal jurisdiction, unless the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction." *Id.* Where the plaintiff's complaint and supporting affidavits and defendant's affidavits conflict, the district court must "construe all reasonable inferences in favor of the plaintiff." *Id.*

A plaintiff who brings state-law claims and asserts personal jurisdiction over a nonresident defendant must surmount two obstacles. The exercise of jurisdiction must first, be appropriate under the particular state's long-arm statute and second, cannot violate the Due process Clause of the Fourteenth Amendment. *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.,* 593 F.3d 1249, 1257 (11th Cir.2010).

#### II. THE GEORGIA LONG–ARM STATUTE

Defendant Michilin argues that it is not subject to the Georgia long-arm statute and that it further lacks "minimum contacts" with Georgia sufficient to satisfy due process. The Georgia long-arm statute permits the exercise of personal jurisdiction

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 3 of
41

Askue v. Aurora Corp. of America, Not Reported in F.Supp.2d (2012)
Case 1:13-cv-01901-IQE-Document 41-8-7 Filed 07/03/13   Page 3 of 41

over a nonresident who (1) transacts any business within Georgia; (2) commits a tortious act or omission within Georgia, with an exception for defamation; or (3) commits a tortious injury in this state caused by an act or omission outside of Georgia, if the tortfeasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state. [2] O.C .G.A. § 9–10–91.

**A. Sub–Section (1): Transacts Any Business**

**\*2** The first prong of the Georgia long-arm statute confers personal jurisdiction over a resident who "transacts any business" within Georgia. O.C.G.A. § 9–10–91(1). Although previous federal jurisprudence viewed the Georgia long-arm statute as co-extensive with the reach of the Due Process Clause, such that federal (and state) courts had frequently ignored the Georgia statute and launched immediately into a due process analysis, the Georgia Supreme Court has indicated that this approach is wrong. *See Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames,* 279 Ga. 672, 620 S.E.2d 352 (2005). That is, "the Georgia long-arm statute does not grant courts in Georgia personal jurisdiction that is coextensive with procedural due process. Instead, the long-arm statute must be read literally. It imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc. .,* 593 F.3d 1249, 1259–61 (11th Cir.2010) (explaining *Innovative Clinical* decision).

Thus, at least in theory, a non-resident defendant could engage in conduct that would be sufficient to confer personal jurisdiction under the Due Process Clause, but insufficient to confer this jurisdiction under a more exacting Georgia long-arm statute. In other words, as to sub-section 1 of the statute, Georgia's notion of what it means to transact business in the state could be stricter than the test that would be applied by a federal due process analysis. For this reason, an analysis that looked only to the due process test would be incomplete.

To decipher in what way the Georgia definition of "transacting business" is more onerous, or even different, than the standard that would be imposed on such activity by the Due Process Clause, it is essential that there be some substantive definition of the term "transacts business" in Georgia law. Without a definition of the term, courts will be unsure of the statute's contours and will be forced, out of necessity, to default back to a due process analysis. [3]

Unfortunately, as the Eleventh Circuit has noted in its exhaustive dissection of the *Innovative Clinical* opinion, "Georgia courts have yet to fully explain" what the "[t]ransacts any business" language means. *Diamond Crystal,* 593 F.3d at 1262. Given that gap, the Eleventh Circuit has indicated that "unless and until the Georgia courts provide further authoritative guidance, courts in this circuit construing the statute literally will have to delineate the precise contours of the '[t]ransacts any business within this state' requirement ... according to the facts of each case." *Id.* at 1363. The Circuit has cautioned federal courts, however, that in undertaking this obligation, they must:

> resist any temptation to define "[t]ransacts any business" solely or primarily in terms of the "foreseeability" of an impact on the Georgia forum.... To do so would once again improperly conflate the long-arm and due process inquiries....[E]ngrafting a "foreseeability" component, which the Georgia General Assembly has not seen fit to include ... would amount to just the sort of extension of the long-arm statute beyond its literal terms that the Georgia Supreme Court rejected in *Innovative Clinical.*

**\*3** *Id.* at 1363 n. 15. Rather, federal courts interpreting the statutory language "must be limited to the bare language of the statute." *Id.*

Having explained the task, the Eleventh Circuit made the first stab at executing its own directive. The court noted that, "interpreted literally," the term "transacts any business," requires the defendant to have "purposefully done some act or consummated some transaction in [Georgia]...." *Id.* at 1264 (citations omitted). Nevertheless, a defendant need not physically enter the state to have transacted business therein, meaning that "intangible" acts, such as mail and telephone calls to Georgia, should be considered. *Id.* In the case before the Circuit, the defendant had sent purchase orders to a Georgia manufacturer, had required delivery by customer pickup, had arranged for third parties to pick up in Georgia the product that the parties had purchased, and had promised to pay money into Georgia. *Id.* at 1265. The Eleventh Circuit concluded that this conduct constituted the transaction of

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 4 of
Case 1:13-cv-01901-JOF   Document 41-8-7   Filed 07/03/13   Page 4 of 41

Askew v. Aurora Corp. of America, Not Reported in F.Supp.2d (2012)

business within Georgia by the defendant. Accordingly, the plaintiff had satisfied sub-section 1 of the long-arm statute.

In the present case, however, the defendant did none of the things that gave rise to personal jurisdiction in *Diamond Crystal.* Specifically, as set out in the affidavit of CEO Frank Chang, defendant Michilin is not licensed, authorized, or registered to do business in any state. (Chang Aff. [44] at ¶ 11.) It does not, nor has it ever, maintained an office or place of business in Georgia. (*Id.* at ¶ 12.) Similarly, it has never had any employees, including sales persons, representatives, agents or services, located within or conducting business in Georgia. (*Id.* at ¶¶ 13, 19.) Further, defendant Michilin does not do any advertising in Georgia and does not solicit business from Georgia. (*Id.* at ¶ 22.) None of its employees have ever attended a trade show or conducted a meeting in this state either. (*Id.* at ¶ 25.) It has "no knowledge that its products will be sold in Georgia." (*Id.* at ¶ 23.) Finally, defendant had no involvement with distribution or sale of its product once it was delivered to Aurora Corporation of America in California. (*Id.* at ¶ 6.)

Even assuming that plaintiffs presented a prima facie case of personal jurisdiction for defendant Michilin, the defendant has, with the above affidavit, rebutted this inference, thereby shifting the burden to plaintiffs to demonstrate the existence of jurisdiction. Plaintiffs offer no affidavit or other evidence in response, however, and merely argue that "[d]efendant Michilin undoubtedly knew that its products were going to be distributed in Georgia because it sold these products to a United States-based distributor that services Georgia." (Resp. Br. [45] at 5–6.)

Plaintiffs' Second Amended Complaint, however, does not allege that the United States-based distributor actually services Georgia. An argument in a brief is not evidence and the Court cannot speculate about what defendant Michilin knew, did not know, or should have known. Moreover, even if true, this assertion does not demonstrate that the defendant transacted business in Georgia. Accordingly, plaintiffs have not shown that defendant Michilin transacted any business in Georgia and has failed to demonstrate jurisdiction under sub-section 1 of the long-arm statute.

### B. Sub–Sections 2 and 3: Tortious Acts

**\*4** Under sub-section 2, a Georgia court may exercise personal jurisdiction over a nonresident who commits a tortious act or omission within Georgia, insofar as the exercise of that personal jurisdiction comports with

constitutional due process. *Innovative Clinical,* 279 Ga. at 674, 620 S.E.2d 352. No act or omission by defendant Michilin occurred in Georgia. Only the alleged tortious injury occurred within Georgia. Under these circumstances, sub-section 2 does not offer a basis for personal jurisdiction. *See Id.* at 673–74, 620 S.E.2d 352 (affirming requirement that a nonresident "must do certain acts" as delineated by the statute before nonresident is subject to personal jurisdiction in Georgia); *Anderson v. Deas,* 273 Ga.App. 770, 772–73, 615 S.E.2d 859 (2005) ("[a]lthough the injurious consequences would have been felt in Georgia, it is undisputed that [defendant] never came to Georgia so as to commit an act here."), *holding undisturbed on remand,* 279 Ga.App. 892, 632 S.E.2d 682 (2006) ("We further concluded that jurisdiction was not sustainable under paragraph (2) based on [defendant's] commission of a tortious act within this state.").

Under sub-section 3, a Georgia court may exercise personal jurisdiction over a nonresident who commits a tortious injury in Georgia caused by an act or omission outside Georgia, only if the tortfeasor "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state." *Innovative Clinical, LLC,* 279 Ga. at 674, 620 S.E.2d 352.

Defendant Michilin's affidavit makes clear that it does not regularly conduct or solicit business, engage in any other persistent course of conduct, or derive substantial revenue from goods used or consumed, or services rendered, in Georgia. Plaintiffs offer no evidence to rebut this affidavit, but instead ask the court to speculate that because defendant Michilin's products were purportedly sold in this market, they "undoubtedly derived substantial revenue from the sale of these products" and that "[d]efendant Michilin engaged in a persistent course of conduct in Georgia by engaging a distributor to sell its products in this market." (Resp. Br. [45] at 8.) These assertions are wholly conclusory and insufficient to sustain a finding of jurisdiction under the long-arm statute.

In short, plaintiff has failed to demonstrate personal jurisdiction under the statute.

### III. *FEDERAL DUE PROCESS*

As the plaintiff has failed to prove the existence of personal jurisdiction under the Georgia long-arm statute, the Court does not need to reach the question whether such jurisdiction, even if it existed, would violate the Due Process Clause of the Fourteenth Amendment. Nevertheless, given the uncertainty

Case No. 1:13-cv-01493-PAB-KLM Document 19-8 filed 07/03/13 USDC Colorado pg 5 of
Case 1:13-cv-01901-JOF Document 8-7 Filed 07/03/13 Page 5 of 41

Askue v. Aurora Corp. of America, Not Reported in F.Supp.2d (2012)

of the definition of "transacts business" under Georgia law, the Court will examine the impact of the Clause on this question.

Due process is satisfied "if the non-resident defendant has established 'certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.' " *Oldfield v. Pueblo de Bahia Lora, S.A.,* 558 F.3d 1210, 1220 (11th Cir.2009) (*quoting Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). Once a plaintiff has shown that defendant has "minimum contacts" with the forum, the burden shifts to the defendant to make a " 'compelling case' that the exercise of jurisdiction would violate ... fair play and substantial justice ." *Diamond Crystal Brands, Inc.,* 593 F.3d at 1267.

**\*5** Although a defendant's minimum contacts may give rise to either "general" or "specific" personal jurisdiction, the parties appear to agree that the latter will determine the outcome here. To assert specific jurisdiction, a defendant's contacts with the forum (1) must be related to the plaintiff's cause of action or have given rise to it, (2) must involve some act by which the defendant purposefully availed itself of the privilege of conducting activities within the forum, and (3) must be of a nature that the defendant should reasonably anticipate being haled into court in the forum. *Sloss Indus. Corp. v. Eurisol,* 488 F.3d 922, 925 (11th Cir.2007).

The primary dispute between the parties is whether defendant Michilin, by selling a product that it might have anticipated could enter the stream of commerce in Georgia, purposefully avail[ed] itself of the privilege of conducting activities within the forum." *Id.* Plaintiffs' argument that defendant Michilin is subject to jurisdiction is, in essence, as follows: defendant Michilin made products available for sale in the United States through a California distributor. One of these products ended up in Georgia. Defendant Michilin should have anticipated that this could occur. Therefore, defendant Michilin purposely availed itself of the privilege of conducting activities within the forum, thus invoking the benefits and protections of the laws of the State of Georgia. (Resp. Br. [45] at 12–13.)

Plaintiffs rely on the "stream of commerce" theory of personal jurisdiction, which provides that "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation

that they will be purchased by consumers in the forum State." *Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, 1546 (11th Cir.1993) (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297–98, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

The "stream of commerce" theory provides the easier test for a plaintiff to meet. The Eleventh Circuit has also applied, but not explicitly adopted, a more onerous test: the "stream of commerce plus" analysis, which arose from Justice O'Connor's plurality opinion in *Asahi Metal Indus. Co., Ltd. v. Superior Court of California,* 480 U.S. 102, 110, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). The "stream of commerce plus" test not only requires that the defendant place, in the stream of commerce, a product that ends up in the forum state, but also that the defendant do something more to "purposefully avail itself of the market in the forum State." *Vermeulen,* 985 F.2d at 1547 (citing *Asahi Metal Indus. Co., Ltd. v. Superior Court of California,* 480 U.S. 102, 110, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)).

In *Asahi,* Justice O'Connor explained that additional conduct by the defendant, such as designing the product for the market in the forum state, advertising in the forum state, establishing channels for providing regular advice to customers in the forum state, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum state, may indicate an intent to serve the market and purposefully avail themselves to the forum. *Asahi Metal Indus.,* 480 U.S. at 112.

**\*6** It is unclear which of the two tests the Eleventh Circuit endorses in determining personal jurisdiction as to upstream manufacturers whose products injure downstream consumers. *See Vermeulen, supra* (applying "stream of commerce plus" test, but not explicitly adopting it); *Morris v. SSE, Inc.,* 843 F.2d 489, 493 n. 5 (11th Cir.1988) (applying Justice O'Connor's test from *Asahi* and noting that satisfaction of the narrower test articulated by O'Connor satisfies other broader tests articulated in *Asahi* ). *But see Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.,* 207 F.3d 1351, 1357–58 (11th Cir.2000) (applying "stream of commerce" test and *Calder* effects test). Indeed, courts in this circuit and elsewhere continue to stumble around in search of the proper standard. *See Vermeulen,* 985 F.2d at 1548 n. 17 (citing cases which "declined to follow" the plurality in *Asahi* and continue to apply "stream of commerce" analysis).

Askue v. Aurora Corp. of America, Not Reported in F.Supp.2d (2012)

Defendant argues that the "stream of commerce" test relied upon by plaintiffs is no longer good law after *J. McIntyre Machinery, Ltd. v. Nicastro,* —U.S. ——, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011). *Nicastro* arose from a products liability suit filed in a New Jersey state court. *Id.* at 2786. Plaintiff Nicastro seriously injured his hand while using a metal-shearing machine manufactured by defendant J. McIntyre Machinery, Ltd. *Id.* Although the accident occurred in New Jersey, the machine was manufactured in England where the defendant was incorporated and operated. *Id.*

The New Jersey Supreme Court found the assertion of jurisdiction comported with due process based on three primary facts. First, an independent company agreed to sell the defendant's machines in the United States (although the defendant made no sales beyond the United States distributor and the distributor was not under its control). *Id.* Second, officials for the defendant's company attended annual conventions for the scrap recycling industry to advertise the defendant's machines alongside the distributor. *Nicastro,* 131 S.Ct. at 2786. (These conventions took place in various states, however, but never in New Jersey.) Third, four machines, including the machine that caused the plaintiff's injuries, ended up in New Jersey. *Id.*

The New Jersey Supreme Court also noted that the defendant held patents in the United States and Europe on its recycling technology, and that the United States distributor structured its advertising and sales efforts under the defendant's direction and guidance. *Id.*

The New Jersey Supreme Court held that jurisdiction was proper because the petitioner knew or reasonably should have known "that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states" and because the defendant failed to "take some reasonable step to prevent the distribution of its products in this State." *Id.* at 2786.

**\*7** The Supreme Court reversed, in a 6–3 plurality decision. In reaching this conclusion, Justice Kennedy, writing for four justices, explained that the term "stream of commerce" is nothing more than a metaphor that refers to the movement of goods from manufacturers through distributors to consumers. *Id.* at 2788. According to the plurality opinion, this metaphor, which was relied upon by the New Jersey Supreme Court as a theory for jurisdiction, arose from the unexceptional proposition that placing goods into the marketplace "with the expectation that they will be purchased by consumers

with the forum State *[might] indicate purposeful availment."* *Nicastro,* 131 S.Ct. at 2788 (emphasis added). The true inquiry, according to the plurality, is whether the defendant's activities manifested an intention to submit to the power of a sovereign, by purposefully availing itself of the privilege of conducting activities within the forum state, and thereby invoking the benefits and protections of its laws. *Id.* The Court rejected an alternative approach that discards the concept of sovereign authority in favor of considerations of fairness and foreseeability. *Id.* at 2789–90. In essence, Justice Kennedy's plurality opinion adopted the "stream of commerce plus" theory of jurisdiction, taken from Justice O'Connor's view in *Asahi. Id.* at 2790 (describing conclusion that "the authority to subject a defendant to judgment depends on purposeful availment" as "consistent with Justice O'Connor's opinion in *Asahi"* ).

Justice Breyer, joined by Justice Alito, concurred. He agreed with the plurality that the facts presented were insufficient to demonstrate "purposeful availment," as set forth in prior precedents, but he refused to adopt either the plurality's "seemingly strict no-jurisdiction rule" or the New Jersey Supreme Court's "absolute approach." *Id.* at 2792–93. For Justice Breyer, the record before the Court did not show that the British manufacturer "purposefully avail[ed] itself of the privilege of conducting activities within New Jersey, or that it delivered its goods in the stream of commerce with the expectation that they will be purchased by New Jersey users." *Id.* at 2792 (internal quotations omitted). In other words, under either past precedent, as Justice Breyer read it, or the more stringent approach adopted by the plurality, asserting jurisdiction over the defendant would violate due process.

Given the Supreme Court's failure to clarify its earlier plurality holding in *Asahi,* this Court must construe the holding of *Nicastro* as "that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977); *United States v. Robison,* 505 F.3d 1208, 1221 (11th Cir.2007). The "narrowest grounds" is understood as the "less far-reaching" common ground. *Robison,* 505 F.3d at 1221.

Justice Breyer's opinion purports to rely on existing precedent to reach its conclusion. Its most narrow holding provides that on the facts presented to the New Jersey Supreme Court, the defendant did not purposefully avail itself of the jurisdiction of New Jersey. *Ainsworth v. Cargotec USA, Inc.,* No. 2:10–CV–236–KS–MTP, 2011 WL 4443626, at \*7

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 7 of
Case 1:13-cv-01301-JOF   Document 8-7   Filed 07/03/13   Page 7 of 41

Askue v. Aurora Corp. of America, Not Reported in F.Supp.2d (2012)

(S.D.Miss. Sept.23, 2011) (describing *Nicastro* as limited in its applicability and "[a]t best, it is applicable to cases presenting the same factual scenario that it does"). *See also Windsor v. Spinner Indus. Co., Ltd.,* —— F.Supp.2d ——, No. JKB–10–114, 2011 WL 5005199, at *5 (D.Md. Oct.20, 2011) (construing *Nicastro* as rejecting the foreseeability standard of personal jurisdiction, but otherwise leaving the legal landscape untouched and applying the Fourth Circuit's post-*Asahi* precedents to resolve the case); *Lindsey v. Cargotec USA, Inc.,* No. 4:09CV–00071–JHM, 2011 WL 4587583, at *7 (W.D.Ky. Sept.30, 2011) ("because ... [*Nicastro* ] did not conclusively define the breadth and scope of the stream of commerce theory ... and given Justice Breyer's decision to rely on current Supreme Court precedents, the Court will continue to adhere to the Sixth Circuit's analysis of purposeful availment").

**\*8** Assuming that the only inference that one can properly draw from the *Nicastro* holding is that the decision is limited to its own facts, defendant Michilin bears a striking similarity to the defendant in *Nicastro*. Like defendant J. McIntyre, defendant here sold its product to a distributor in the United States, and no sales were made by defendant beyond that distributor. Second, as with J. McIntyre, only a small number of machines wound up in the forum state (one here, four by J. McIntyre). Indeed, defendant had fewer contacts here than did J. McIntyre. That is, none of defendant Michilin's employees have been alleged to have attended any conferences in Georgia. In fact, unlike the additional contacts with the United States that J. McIntyre had, there is no indication in the record that defendant Michilin's employees have attended conferences anywhere in the United States. Defendant Michilin also lacks the two additional contacts with the United States that the New Jersey Supreme Court identified: a United States patent and a United States distributor who structures its advertising and sales efforts under the foreign defendant's direction and guidance.

In sum, whatever test governs foreign nonresident manufacturers whose products enter the State of Georgia and injure its residents, the presents facts, which are materially similar to those of *Nicastro,* do not demonstrate that defendant Michilin "purposeful[ly] avail[ed]" itself of the jurisdiction of the State of Georgia. *N. Ins. Co. of N.Y. v. Constr. Navale Bordeaux,* No. 11–60462–CV, 2011 WL 2682950, at *5 (S.D.Fla. July 11, 2011) (twenty sales in state over 2.4 years, control over how the independent dealer makes those sales, appearance at six trade shows in Florida, and industry advertising were insufficient to demonstrate

"something more" required in due process analysis); *Dejana v. Marine Tech., Inc.,* No. 10–CV–4029(JS)(WDW), 2011 WL 4530012, at *6 (E.D.N.Y. Sept. 26, 2011) (no jurisdiction over seller of specialized, expensive racing boats meant to be used on racing circuits that include events in forum where there were no representatives in forum, no boats delivered in forum, and no sales solicitations in forum); *Oticon, Inc. v. Sebotek Hearing Sys., LLC,* F.Supp.2d, No. 08–5489(FLW), 2011 WL 3702423, at *10 (D.N.J. Aug.22, 2011) ("Under *Nicastro,* whether it is five or nine sales by [defendant] of [codefendant's] allegedly infringing products, that is simply too small of a number from which to conclude that [codefendant] purposefully availed itself of the New Jersey market."); *Powell v. Profile Design LLC,* No. 4:10–cv–2644, 2012 WL 149518, at *8 (S.D.Tx. Jan.18, 2012) (sale of [defective] bicycle stem in California simply does not rise to level of actions purposefully directed at [forum] ). *Compare Morris v. SSE, Inc.,* 843 F.2d 489 (11th Cir.1988) (Justice O'Connor's *Asahi* test satisfied where nonresident defendant repaired products for delivery to forum, advertised in forum based on national trade magazines, and products were hazardous); *Vermeulen,* 985 F.2d at 1550 (personal jurisdiction over foreign state under FSIA consistent with due process where defendant designed the product for the American market, advertised in the United States, and maintained a distribution network); *Brooks & Baker, L.L.C. v. Flambeau, Inc.,* No. 2:10–cv–146–TJW–CE, 2011 WL 4591905, at *4 (E.D.Tx. Sept.30, 2011) (distinguishing *Nicastro* where defendant admitted that it inserted accused products into the stream of commerce with the intention that the products reach a national market, along with many more than just one isolated sale to forum); *DRAM Techs. LLC v. Am. II Grp., Inc.,* No. 1:10–CV–45–TJW, 2011 WL 4591902, at *3 (E.D.Tx. Sept.30, 2011) (distinguishing Nicastro where sophisticated electronics manufacturer was aware that its products would be distributed in the United States, twenty-five models of product were in forum, internet sales provided direct shipping to forum, employees regularly visited several United States-based customers, and formerly had an American affiliate).

**\*9** Because asserting personal jurisdiction over defendant Michilin would offend due process, defendant Michilin's Motion to Dismiss [44] is also merited on this alternative ground.

*CONCLUSION*

For the foregoing reasons, defendant Michilin's Motion to Dismiss [44] is **GRANTED.** The Aurora defendants shall file their response to defendant Michilin's Motion to Dismiss Cross-claims [50] by **March 26, 2012.** (See Order of Aug. 30, 2011[52].)

SO ORDERED.

**Footnotes**

1    Defendant Michilin Prosperity Co., Ltd. has also filed a Motion to Dismiss Cross-claims [50]. Per this Court's Order of August 30, 2011 [52], no response to this motion will be due until 14 days after the Court issues this order.

2    Sub-section (4) of the statute provides jurisdiction where a defendant owns, uses, or possesses any real property situated within Georgia. Plaintiffs admit that defendant Michilin "probably" owns no property in Georgia and does not meet section (4). (Resp. Br. [45] at 9.) More importantly, they offer no evidence to contradict defendant Michilin's affidavit averring that it has no real estate in Georgia.

        The two final sub-sections of O.C.G.A. § 9–10–91 govern domestic matters not implicated by this litigation. *See* O.C.G.A. § 9–10–91(5) and (6).

3    Indeed, the *Diamond Crystal* opinion notes that, since *Innovative Clinical,* the Georgia Court of Appeals has issued an opinion interpreting sub-section 1 that appears to continue to collapse the long-arm test into a "minimum contacts" inquiry under the Due Process Clause. *Diamond Crystal,* 593 F.3d at 1260 n. 11 (discussing *Aero Toy Store, LLC v. Grieves,* 279 Ga.App. 515, 631 S.E.2d 734 (2006).

**End of Document**                                      © 2013 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 2138759
Only the Westlaw citation is currently available.
United States District Court,
M.D. Georgia, Valdosta Division.

BAYER CROPSCIENCE, LP, Plaintiff,

v.

Nick BOOTH, Mary Jo Booth, Keith Cox,
Kenneth Lee, Dolly Lee, Harold Tiner, Era
Tiner, and Steven Maples, Defendants.

No. Civ.A. 7:04-CV-92.   |   Aug. 31, 2005.

**Attorneys and Law Firms**

R. Wayne Bond, Jessie C. Fontenot, Jr., Atlanta, GA, Stanley Boyd Green, Winston-Salem, NC, for Plaintiff.

C. Dorian Britt, Brent J. Savage, Savannah, GA, for Defendants.

**Opinion**

### ORDER ON MOTION TO DISMISS

LAWSON, J.

 *1 Before the Court is Defendants' Motion to Dismiss Plaintiff's Complaint for Declaratory Relief (Doc. 19). Defendants contend that Bayer lacks standing to bring this claim as a declaratory judgment action and that any controversy between Bayer and Defendants is not ripe for review. Upon review of the arguments of counsel and the relevant legal authorities, and for the reasons set forth below, the Court finds that there Bayer has standing to bring a declaratory judgment action in this case and that it is ripe for review. As such, the Court has discretion to exercise jurisdiction over the case under the Declaratory Judgment Act (22 U.S.C. § 2201). Accordingly, the Motion to Dismiss is DENIED. For the reasons set forth below, however, the Court declines to exercise its jurisdiction in favor of a parallel case in the State Court of Clinch County, Georgia. This case is hereby STAYED pending resolution of the state case.

### 1. Procedural Background

In this case and in the parallel case, recently remanded by this Court, the parties have engaged in a considerable amount of procedural wrangling to select their preferred forum. Both

cases center around the allegations of the Defendants in this case, a group of farmers who allege that their blueberry crops were severely damaged by Bayer's "Rovral" fungicide product. In May of 2004, Defendants sent two demand letters to Bayer, requesting compensation for the alleged damages to their crops and threatening litigation. Bayer received a third demand letter dated July 16, 2004, in which the Defendants alleged damages in excess of $3 million. Bayer responded by filing this declaratory judgment action on August 27, 2004, as a preemptive attempt to secure federal jurisdiction and advance its argument that any claims related to the use of Rovral are pre-empted by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*

On March 16, 2004, Defendants filed their actual coercive claim in the State Court of Clinch County. Bayer promptly removed the state case to this Court, alleging federal question jurisdiction pursuant to the preemption provisions of FIFRA and fraudulent joinder of the Board of Regents of the University System of Georgia as a non-diverse party. In a recent order, the Court has remanded the coercive action to the State Court for lack of subject matter jurisdiction. See *Booth,* et al. *v. Bayer CropScience, LP,* 7:05-cv-34, August ___, 2005 Order (Doc. ___ ). In its remand order, the Court noted that Bayer's federal pre-emption argument has been rejected by the Supreme Court of the United States, in *Bates v. Dow AgroScience, LLC.,* --- U.S. ----, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005).

### 2. Declaratory Judgment-Case or Controversy Requirement

Bayer's Complaint in this case sets forth a real case or controversy sufficient to permit a declaratory judgment action. The Declaratory Judgment Act provides that "in the case of actual controversy within its jurisdiction," a district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether further relief is or could be sought." 22 U.S.C. § 2201(a). In accordance with the requirements of Article III of the United States Constitution, courts have jurisdiction to issue declaratory relief only where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941).

 *2 The legal dispute between Bayer and the Defendants is of sufficient immediacy and reality to warrant a declaratory judgment action. In general, to establish standing a plaintiff

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 10
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 10 of 41

Bayer CropScience, LP v. Booth, Not Reported in F.Supp.2d (2005)

must show: "(1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Koziara v. City of Casselberry,* 392 F.3d 1302, 1304 (11 th Cir.2004). A plaintiff seeking only declaratory relief "must prove not only an injury, but also 'a 'real and immediate threat' of future injury in order to satisfy the "injury in fact" requirement." ' *Id.* at 1305 (quoting *Nat'l Parks Conservation Ass'n v. Norton,* 324 F.3d 1229, 1241 (11th Cir.2003)).

In this case, the threat of litigation by Defendants against Bayer established a real and immediate threat of future injury. Defendants sent Bayer demand letters on May 4, 2004, and on May 27, 2004, in which Defendants requested compensation for damage to their crops, and threatened suit. Although there appears to be no authority from the Eleventh Circuit directly on the issue, courts in other circuits have held that a specific and concrete threat of litigation, such as a demand letter with a notice of intent to file suit, can constitute an actual controversy for purposes of declaratory judgment. See, e.g. *Orix Credit Alliance, Inc. v. Wolfe,* 212 F.3d 891, 897 (5 th Cir.2000), *NUCOR Corp. v. Aceros Y Maquilas de Occidente,* 28 F.3d 572, 578 (7th Cir.1994). These cases are generally consistent with the holding of the Eleventh Circuit in *GTE Pub. Corp. V. Trimen America, Inc.,* 67 F.3d 1563 (11 th Cir.1995), in which the court found an actual controversy to exist where the plaintiff wished to engage in the specific conduct of contacting the defendant's customers, and the defendant claimed that any such conduct would result in a lawsuit. There is a real controversy between Bayer and Defendants concerning the connection between Bayer's Rovral product and alleged damage to Defendants' crops. Defendants' demand letters established a threat of litigation that could cause injury to Bayer's interests.

**3. Declaratory Judgment-Discretion**

Although the threat of litigation raised by Defendants' demand letters may have been sufficient to create an actual controversy over which the Court can take jurisdiction, the Declaratory Judgment Act does not require the Court to exercise its jurisdiction. Even when a suit otherwise satisfies subject-matter jurisdiction, the Declaratory Judgment Act confers on the district court "unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.,* 515 U.S. 277, 286, 115 S.Ct. 2137,

132 L.Ed.2d 214 (1995). Courts exercise this discretion with attention to "considerations of practicality and wise judicial administration." *Id.* at 288. The balance of circumstances in this case weigh against further proceedings in this forum. Most significant is that there is currently pending in the State Court of Clinch County the actual coercive action that was threatened by the Defendants in their notice letter. That action was filed several months after the filing of this case. Considerations of practicality and wise judicial administration favor deference to the state action as the more appropriate forum for the resolution of this dispute.

*\*3* In exercising their discretion under the Declaratory Judgment Act, courts have looked critically at preemptive actions such as this one, where a potential defendant upon receiving a notice letter immediately files a declaratory judgment action. As appears to be the case in this action, preemptive declaratory actions are frequently initiated in an attempt "to gain procedural advantage and preempt the forum choice of the plaintiff in the coercive action." *Federal Ins. Co. v. May Dept. Stores Co.,* 808 F.Supp. 347, 350 (11 th Cir.1992). Such a declaratory action usurps the normal status of the plaintiff as the "master of his claim," with the power to choose the forum and the legal theory of the case. See *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 391, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). Generally, a plaintiff has discretion to "avoid federal jurisdiction by exclusive reliance on state law" *Id.*

Although Bayer's federal declaratory action was filed before the Defendants coercive state action, this Court "decline[s] to place undue significance on the race to the courthouse door." *Centennial Life Ins. Co. v. Poston,* 88 F.3d 255, 258 (4 th Cir.1996). In the exercise of a court's discretion under the Declaratory Judgment Act, the interests of the true plaintiff in defining his own claim may warrant preference for a later-filed coercive action, contrary to the usual "first filed" principle. "When the declaratory judgment action has been triggered by a notice letter, this equitable consideration may be a factor in the decision to allow the later filed action to proceed to judgment in the plaintiffs' chosen forum." *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 219 (2 nd Cir.1978) (overruled on other grds. by *Pirone v. MacMillan, Inc.,* 894 F.2d 579 (2d Cir.1990)) (citing *Amerada Petroleum Corp. v. Marshall,* 381 U.S. 661, 663 (5th Cir.1967)). The fact that this case was triggered by a notice letter is an important consideration in this Court's decision to allow the case to proceed in the state court.

Bayer CropScience, LP v. Booth, Not Reported in F.Supp.2d (2005)

Events subsequent to the filing of Bayer's Complaint confirm that the Court should exercise its discretion to stay this case in favor of the state proceedings. With its preemptive declaratory action, Bayer has sought to define this case as one governed by a comprehensive federal statute, the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.* When the Defendants filed their coercive lawsuit in the state court, however, they pleaded only claims under state law, and avoided federal claims. In its Complaint and its Motion for Judgment on the Pleadings, Bayer contends that FIFRA preempts state-law actions related to the design, manufacture, and labeling of fungicides like Bayer's Rovral. In accordance with this contention, Bayer seeks "a declaration that the Defendants' claims are preempted and that their remedies, if any, are limited to those provided on Rovral's approved label." Plaintiff's Memorandum in Support of Motion for Judgment on the Pleadings, Doc. 21, p. 2.

*4 Several months after Bayer filed its Complaint, in April of 2005, the United States Supreme Court rejected that argument in a factually similar case. In *Bates v. Dow AgroScience, LLC.,* --- U.S. ----, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005), the Court held that FIFRA did not preempt state law claims for negligent design and manufacture and for breach of warranty. In its Order on Motion to Remand in the Defendants' coercive action (*Booth,* et al. *v. Bayer CropSciences, LP,* 7:05-cv-34, August ___, 2005), this Court applied the *Bates* Court's reasoning to hold that the plaintiffs' (Defendants in this case) claims under the Georgia law of fraud were also not preempted by FIFRA. *Bates* holds, at the very least, that Defendants need not pursue any federal claims under FIFRA, if they choose to proceed solely under state law. Defendants have chosen to do so, and there is no indication of any imminent threat that they will seek to add federal claims to their state-court action.

Although they do not appear to involve any particularly difficult issues of Georgia law, Defendants' state law claims are better pursued in the state courts. The state courts are the forum of choice for the Defendants. There is no additional inconvenience for any party to litigate in that forum as opposed to this Court. Most of the Defendants live in or around the Clinch County area. Plaintiff is a major multinational corporation, has retained counsel from Atlanta, and will likely have to transport witnesses regardless of the forum. The seat of Clinch County, Homerville, is no more than forty miles from this Court's courthouse in Valdosta. Finally, the state court action is entitled to preference over this action because it is more complete than this action. The state court action includes a defendant, the Board of Regents of the University System of Georgia, that has not been joined in this case. Joinder of the Board of Regents would eliminate this Court's diversity of citizenship jurisdiction, and the holding in *Bates* makes it unlikely that this Court can maintain federal question jurisdiction.

Because the state court is the better forum for resolution of this dispute, the Court exercises its discretion pursuant to 28 U.S.C. § 2201(a) to stay this matter pending resolution of the state court action. The parties shall notify the Court within 60 days of the conclusion of the litigation in that forum. If for any reason there are matters that the state action was unable to resolve, the Court will entertain a motion to reopen the case. Otherwise, this case will be dismissed at that time.

All other pending motions in this case are hereby administratively dismissed. If necessary, such motions may be reentered upon lift of stay.

SO ORDERED.

---

**End of Document**     © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 12
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 12 of 41

Bond v. Ivy Tech State College, 167 Fed.Appx. 103 (2006)

167 Fed.Appx. 103
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Eleventh Circuit Rules 36-2, 36-3. (Find
CTA11 Rule 36-2 and Find CTA11 Rule 36-3)
United States Court of Appeals,
Eleventh Circuit.

Barbara BOND, Plaintiff-Appellant,
v.
IVY TECH STATE COLLEGE, Defendant-Appellee.

No. 05-11491   |   Non-Argument
Calendar.   |   D.C. Docket No. 04-00309-
CV-J-32-MMH.   |   Feb. 10, 2006.

**Synopsis**
**Background:** Former employee of an Indiana community
college sued the college, alleged that the college breached the
terms of a settlement agreement struck between the parties to
sever the employee's employment. The United States District
Court for the Middle District of Florida dismissed, and the
employee appealed.

**Holdings:** The Court of Appeals held that:

[1] district court lacked personal jurisdiction under Florida's
long-arm statute, and

[2] refusal to transfer the case to Indiana was not an abuse of
discretion.

Affirmed.

West Headnotes (2)

[1]     **Federal Courts**
        ⬤ Contract Cases
        District court lacked personal jurisdiction under
        Florida's long-arm statute over an Indiana

community college in a former employee's
action claiming that the college breached the
terms of a settlement agreement concerning
severance of the employee's employment; the
settlement agreement did not require the college
to perform acts in Florida, 98 percent of the
college's students were from Indiana, and its
limited contact with Florida via a website was
insubstantial. West's F.S.A. § 48.193(1)(f, g),
(2).

4 Cases that cite this headnote

[2]     **Federal Courts**
        ⬤ Other Particular Cases
        District court's refusal to transfer to Indiana
        an action brought by a former employee of an
        Indiana community college against the college
        for allegedly breaching the terms of a settlement
        agreement, was not an abuse of discretion; the
        employee did not show that she could not refile
        the case in Indiana, and she knew Indiana was
        the proper forum when she filed suit in Florida.
        28 U.S.C.A. § 1631.

1 Cases that cite this headnote

**Attorneys and Law Firms**

*104  Barbara Bond, Jacksonville, FL, pro se.

Regina Louise Young, Rogers, Towers, Bailey, Jones & Gay,
Jacksonville, FL, for Appellee.

Appeal from the United States District Court for the Middle
District of Florida.

Before EDMONDSON, Chief Judge, BLACK and PRYOR,
Circuit Judges.

**Opinion**

PER CURIAM:

Plaintiff-Appellant Barbara Bond, proceeding *pro se,* appeals
from a district court order dismissing her civil suit for lack
of personal jurisdiction and further denying her motion to
transfer the case. No reversible error has been shown; we
affirm.

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 13
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 13 of 41

Bond v. Ivy Tech State College, 167 Fed.Appx. 103 (2006)

Plaintiff brought suit in the Middle District of Florida against Ivy Tech State College, a state-supported community college in Indiana and Plaintiff's former employer. Plaintiff alleged that Ivy Tech breached the terms of a settlement agreement struck between the parties to sever Plaintiff's employment. Plaintiff, who was domiciled in Florida at the time she sued, claimed the Florida district court had diversity jurisdiction under 28 U.S.C. § 1332. The district court, however, dismissed the suit for lack of personal jurisdiction over Ivy State pursuant to Fed.R.Civ.P. 12(b)(2).

In dismissing Plaintiff's suit, the court credited Ivy Tech's assertions that it did not engage in business, recruit students, maintain an office, or cause an injury in Florida under the meaning of Florida's long-arm statute. Ivy Tech's campuses are confined to Indiana, and its student population is made up almost entirely of Indiana residents.[1] And even accepting **\*105** Plaintiff's allegations as true, the court rejected her assertions that Ivy Tech had sufficient contacts with Florida through mailing a limited number of student admissions packets to Florida residents, maintaining a website, and offering distance learning courses over the Internet.

**[1]**    We review the district court's dismissal for lack of personal jurisdiction *de novo* and construe all reasonable inferences in favor of the plaintiff. *Meier v. Sun Int'l Hotels, Ltd.,* 288 F.3d 1264, 1268-69 (11th Cir.2002). To determine whether the Florida district court had personal jurisdiction over non-resident Ivy Tech, we use a two-part analysis: 1) whether Florida's long-arm statute provides a basis for jurisdiction, and, if it does, 2) whether Ivy Tech had sufficient minimum contacts with Florida such that satisfy the Fourteenth Amendment Due Process Clause's notions of fair play and substantial justice. *Sculptchair, Inc. v. Century Arts, Ltd.,* 94 F.3d 623, 626 (11th Cir.1996). Under Florida law, the plaintiff bears the burden of proving personal jurisdiction. *Id.* Even construing Plaintiff's pleadings leniently,[2] the district court correctly decided that personal jurisdiction over Ivy Tech is not proper under the Florida long-arm statute and would violate Due Process.

As best we can tell, Plaintiff's pleadings indicate that she believes jurisdiction rests on Fla. Stat. §§ 48.193(1)(f), (1)(g), and (2) (Florida's long-arm statute). Section 48.193(1)(f) provides, in relevant part, jurisdiction over any person "causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state," if the defendant "was engaged in solicitation or service

activities" within Florida. Florida's Supreme Court has held that "the provisions of section 48.193(1)(f) contemplate personal injury or physical property damage;" mere economic injury is insufficient to subject a non-resident defendant to personal jurisdiction in Florida under this section. *Aetna Life & Cas. Co. v. Therm-O-Disc, Inc.,* 511 So.2d 992, 994 (Fla.1987). Because she does not allege personal injury or property damage, jurisdiction is not available under section 48.193(1)(f).

Section 48.193(1)(g) provides jurisdiction over any person "breaching a contract in this state by failing to perform acts required by the contract to be performed in this state." We have written that this section "means that there must exist a duty to perform an act *in Florida;* a contractual duty to tender performance to a Florida resident is not in itself sufficient to satisfy the statute." *Posner v. Essex Ins. Co., Ltd.,* 178 F.3d 1209, 1218 (11th Cir.1999). *See also Travel Opportunities of Fort Lauderdale, Inc. v. Walter Karl List Mgmt., Inc.,* 726 So.2d 313, 314 (Fla.Dist.Ct.App.1998) ("[I]t is not enough that a foreign defendant merely contract with a Florida resident. Rather, the contract itself must require performance in Florida."). The settlement agreement at issue here does not require Ivy Tech to perform acts in Florida.

Section 48.193(2) provides jurisdiction over any defendant "who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise ... [and] whether or not the claim arises from that activity." Plaintiff points to Ivy Tech's website and online class offerings and some evidence that the school sent **\*106** admissions packets to prospective students in Florida as supporting jurisdiction under this section. Florida courts have held that jurisdiction is proper under this section only when the nonresident defendant actually procures business in Florida or solicits business through continued or sustained efforts; solicitation in a "haphazard and sporadic manner" does not confer jurisdiction. *Price v. Point Marine, Inc.,* 610 So.2d 1339, 1341 (Fla.Dist.Ct.App.1992).

Plaintiff has made only bare allegations that she has personal knowledge that application packets were mailed to Florida residents, but she failed to provide details about the contacts. Ivy Tech's uncontroverted evidence shows that 98 percent of its students are from Indiana and that the majority of the remaining students are from bordering states. Even construing all reasonable inferences in Plaintiff's favor, nothing evidences a continuous or sustained effort to solicit students from Florida.

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 14
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 14 of 41

Bond v. Ivy Tech State College, 167 Fed.Appx. 103 (2006)

Never has this Court addressed the question of whether the mere existence of a website that is visible in a forum, by itself, confers jurisdiction over the site's owner. Other circuits, however, have found this circumstance insufficient to confer jurisdiction. *See, e.g., McBee v. Delica Co., Ltd.,* 417 F.3d 107, 124 (1st Cir.2005) ("The mere existence of a website does not show that a defendant is directing its business activities towards every forum where the website is visible...."); *Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.,* 395 F.3d 1275, 1281 (Fed.Cir.2005) ("[T]he ability of District residents to access the defendants' websites ... does not by itself show any persistent course of conduct by the defendants in the District.") (citation omitted).

In *Revell v. Lidov,* 317 F.3d 467, 470-71 (5th Cir.2002), the Fifth Circuit concluded held that a nonresident university's website, which allowed users to subscribe to a journalism review, purchase advertising, and submit electronic admissions applications, did not subject the university to jurisdiction in Texas when the university did not receive more than twenty internet subscriptions from Texas residents. The Fifth Circuit concluded that though "a website is, in a sense, a continuous presence everywhere in the world," the defendant's contacts were "not in any way 'substantial.' " *Id.* at 471. Ivy Tech's limited contact with Florida via its website was similarly insubstantial. [3]

 **[2]**   Plaintiff also argues on appeal that the interests of justice required the court to transfer her case to a district court in Indiana once it found that Florida was not the proper forum. 28 U.S.C. § 1631 states that "[w]henever a civil action is

filed in a court ... and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed." The district court refrained from transferring the case to another forum, and we review its refusal to transfer for an abuse of discretion. *Robinson v. Giarmarco & Bill, P.C.,* 74 F.3d 253, 255 (11th Cir.1996).

We cannot say that the district court abused its discretion by not transferring this case to Indiana. Plaintiff has failed to present evidence or allege that she could not refile the case in Indiana. The evidence further indicates that Plaintiff knew Indiana was the proper forum when she filed suit in Florida. She filed two motions **\*107** in the Northern District of Indiana related to her settlement agreement. Only when those motions were denied did she file her case in Florida. On this record we cannot conclude that the district court abused its discretion when it concluded that Plaintiff's actions "do not show the good faith that would dictate a transfer in the 'interest of justice.' "

For the foregoing reasons we affirm the district court's dismissal of Plaintiff's civil action and refusal to transfer her claims.

AFFIRMED.

**Parallel Citations**

2006 WL 306046 (C.A.11 (Fla.))

---

Footnotes

1   98 percent of students at Ivy Tech are Indiana residents. Of the remaining two percent, most are from states that border Indiana.

2   Parties proceeding *pro se* are entitled to leniency in pleading. *GJR Invs., Inc. v. County of Escambia,* 132 F.3d 1359, 1369 (11th Cir.1998).

3   Because we conclude that the Florida long-arm statute does not provide a basis for personal jurisdiction, the constitutional analysis is unnecessary. *Homeway Furniture Co. of Mount Airy, Inc. v. Horne,* 822 So.2d 533, 536 (Fla.Dist.Ct.App.2002).

---

**End of Document** © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 15
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 15 of 41

Schutz Container Systems, Inc. v. Mauser Corp., Not Reported in F.Supp.2d (2010)

2010 WL 5087865
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia,
Atlanta Division.

SCHÜTZ CONTAINER SYSTEMS, INC., Plaintiff,
v.
MAUSER CORP. and National
Container Group, LLC, Defendants.

Civil Action No. 1:09–CV–
03609–RWS.   |   Dec. 7, 2010.

**Attorneys and Law Firms**

Andrew Collins Doherty, John Jason Williams, Mark V.
Campagna, William B. B. Smith, Jones Day, Atlanta, GA, for
Plaintiff.

Matthew Topic, Megan New, Robin A. McCue, Russell
E. Levine, Kirkland & Ellis, Chicago, IL, Jennifer Liotta,
Robin Lynn McGrath, Alston & Bird, LLP, Atlanta, GA, for
Defendants.

**Opinion**

### ORDER

RICHARD W. STORY, District Judge.

*\*1*  This case comes before the Court on Defendants'
Motion to Amend their Answer, Affirmative Defenses, and
Counterclaims [60], and Plaintiff's Motion for Leave to File
Surreply Brief [69]. After considering the record, the Court
enters the following Order.

### Background

This case arises out of trademark infringement and false
advertising claims related to Plaintiff Schütz Container
Systems, Inc.'s ("Plaintiff") intermediate bulk containers
("IBCs") used for the transportation of goods. Plaintiff
manufactures and sells new IBCs, while Defendant National
Container Group, LLC ("NCG") sells reconditioned and
rebottled IBCs, consisting of a Schütz outer cage and a
new replacement bottle made by Defendant Mauser Corp.
("Mauser"). (See Dkt. No. [60–6] at 2–3). Plaintiff has

accused Defendants NCG and Mauser ("Defendants") of false
advertising and trademark infringement, along with other
claims, on the basis that Defendants' use of the outer cage
displaying the Schütz mark constitutes unauthorized use of
such mark. (See Dkt. No. [60–1] ).[1]

Defendants seek leave of the Court to amend their
Answer, Affirmative Defenses, and Counterclaims. (See Dkt.
No. [60] ).[2] In their proposed First Amended Answer,
Affirmative Defenses, and Counterclaims, Defendants seek
to supplement their earlier filing by (1) joining additional
Counter–Defendants Schütz GmbH & Co. KGaA, Schütz–
Werke GmbH & Co. KG, and Schütz Verwaltungs GmbH,
and (2) asserting against CounterDefendants claims for false
advertising under the Lanham Act, 15 U.S.C. § 1000 et
seq., and violations of the Georgia Uniform Deceptive
Trade Practices Act, O.C.G.A. § 10–1–372. These counter-
claims are predicated on statements posted on the Schütz
website that the practice of cross-bottling in refurbished
IBCs (such as Defendants') "means that the entire system
can no longer be considered tested and approved: can no
longer be considered tested and approved: the results of
interaction between original and non-OEM components are
unknown." (Defendants' First Amended Counterclaims [60–
1] ¶ 24). Neither defendant is mentioned by name on the
website. (See Dkt. No. [60–2] at 18). In addition, both
Defendants move to amend their affirmative defenses to
reflect the dismissal of Plaintiff's patent claims.

Plaintiff does not oppose the amendment of Defendants'
affirmative defenses or the assertion of state and federal false
advertising claims against the existing plaintiff. (See Dkt. No.
[65] at 4). The Court will therefore permit the amendment
with respect to those claims and defenses. However, Plaintiff
opposes the addition of the three additional foreign parties
at this stage of the proceedings on the ground that the
amendment, which was filed four months after the deadline
imposed in the Court's scheduling order, is both untimely and
futile.

### Discussion

When a motion to amend is filed after a scheduling order
deadline, Federal Rule of Civil Procedure 16 is the proper
guide for determining whether a party's delay may be
excused. *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235,
1241(11th Cir.2009) (citing *Sosa v. Airprint Sys.*, 133 F.3d
1417, 1418 n. 2 (11th Cir.1998)). A scheduling order may be

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 16
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 16 of 41

Schutz Container Systems, Inc. v. Mauser Corp., Not Reported in F.Supp.2d (2010)

modified only for good cause and with the Court's consent. FED. R. CIV. P. 16(b)(4). The key to good cause is diligence. *Sosa,* 133 F.3d at 1419.

**\*2** The Eleventh Circuit has identified at least three factors for consideration when evaluating diligence: (1) the movant's efforts failure to ascertain information before the initial filing, (2) the availability of the information to the movant, and (3) the movant's delay in utilizing information made available through discovery responses. *See Wasdin v. Cheetah Transp., LLC,* No. 5:05–cv–340 (DF), 2006 WL 3534969, at \*2 (M.D.Ga. Dec. 7, 2006) (citing *Sosa,* 133 F.3d at 1418).

In the present case, the Court's March 2, 2010 scheduling order limited the amendment period to 30 days after the Order, or April 1, 2010. Defendants learned on or around May 2010 that the Schütz website contained allegedly false and misleading statements. (Dkt. No. [68] at 13). Defendants subsequently filed the instant motion on August 6, 2010, four months after the deadline specified in the scheduling order and nearly three months after this publicly accessible website came to their attention.

With respect to the availability factor, the information at issue has been readily available since the commencement of Plaintiff's original action. (*See* Dkt. No [65] at 8–9). Moreover, with respect to the delay factor, Defendants displayed no sense of urgency in filing the present amendment, despite learning of the allegedly false statements one month past the agreed-upon amendment deadline. Rather, Defendants' only explanation for this delay is a single reference to "conducting a reasonable investigation." (Dkt. No. [68] at 13). This unexplained three-month delay in acting on publicly available information hardly demonstrates diligence on the part of Defendants in seeking this amendment.

The present case presents an even less compelling showing of good cause than those where courts have rejected motions to amend based on similar delays in response to less accessible information. *See Southern Grouts,* 575 F.3d at 1242–43 (denying motion to amend where trademark owner delayed one month after learning through interrogatory response that competitor had purchased ads on Internet search engine for the disputed mark); *E.E.O.C. v. Exel Inc.,* 259 F.R.D. 652, 654–55 (N.D.Ga.2008) (rejecting plaintiff's argument that amendment should be permitted based on evidence adduced during deposition testimony two months before motion). As

such, the Court concludes that Defendants have not shown good cause under Rule 16.

Additionally, even if Defendants could survive the Rule 16(b)(4) challenge, they still must satisfy Federal Rule of Civil Procedure 15. Rule 15 directs the Court to "freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). Despite this admonition, the trial court has "extensive discretion" in deciding whether to grant leave to amend. *Campbell v. Emory Clinic,* 166 F.3d 1157, 1162 (11th Cir.1999).

A trial court may choose not to allow a party to amend "when the amendment would prejudice the defendant, follows undue delays or *is futile." Id.* (emphasis added). A claim is futile if it cannot withstand a motion to dismiss. *See Burger King Corp. v. Weaver,* 169 F.3d 1310, 1320 (11th Cir.1999); *Fla. Power & Light Co. v. Allis Chalmers Corp.,* 85 F.3d 1514, 1520 (11th Cir.1996). Under Rule 15, the movant has the burden of demonstrating the propriety of the amendment. *W.S. McDuffie and Assocs., P.C. v. Owens,* 682 F.Supp. 1226, 1229 (N.D.Ga.1988). If Defendants cannot establish the Court's personal jurisdiction over the proposed parties to be added, then the those prospective counter-defendants would ultimately have to be dismissed, and adding those parties would be futile. *Id.*

**\*3** The Georgia long-arm statute confers personal jurisdiction over nonresidents to the maximum extent permitted by due process. *HTL Sp. Z O.O. v. Nissho Corp.,* 245 Ga.App. 625, 626, 538 S.E.2d 525 (2000). As Georgia's long-arm statute is thus coextensive with the constitutional requirements of due process, the state law and due process analyses collapse into a single inquiry. *Imageline, Inc. v. Fotolia LLC,* 663 F.Supp.2d 1367, 1373 (N.D.Ga.2009). A nonresident defendant's contacts with a forum state may give rise to either "general" or "specific" personal jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 nn. 8 & 9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). For either form of personal jurisdiction, a necessary condition is that there be some act by which the party purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *See Imageline,* 663 F.Supp.2d at 1373 (citing *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

Defendants incorrectly assert that the Court has personal jurisdiction over the parties to be added because each is listed as either the publisher of the website, www.schuetz.net,

Schutz Container Systems, Inc. v. Mauser Corp., Not Reported in F.Supp.2d (2010)

where the false and misleading statements are found, or is listed on the Imprint page of the website as "the personally liable partner." (Defendants' First Amended Counterclaims ¶¶ 9–11). Defendants further argue that the interactive nature of the website is sufficient to confer personal jurisdiction over the parties to be added, as it allows customers to use a personalized "customer reference number" and actively request the pick-up of used containers for reconditioning and refurbishing. (Dkt. No. [68] at 6–7).

However, this Court has previously found in similar circumstances that a website operator was not subject to specific personal jurisdiction in Georgia in a copyright infringement suit where the plaintiff failed to show that the cause of action related to the interactive nature of the website. *See Imageline,* 663 F.Supp.2d at 1376 (finding the forum contact unrelated to the cause of action where the defendant acknowledged that some of its active users resided in Georgia, but plaintiff did not claim that any of those users uploaded any of the allegedly-infringing works to defendant's website or downloaded those works to their personal accounts or computers). Here, Defendants have failed to allege any facts, such as a showing of harm in Georgia resulting from the alleged false and misleading statements, that would demonstrate a link between Defendants' counter-claim and the forum state.

Likewise, absent any allegation that some critical portion of the website's traffic stems from users within this forum, the mere fact of the website's interactivity is insufficient to confer general personal jurisdiction based upon continuous and systematic general business contacts with the state of Georgia. *See id.* (finding that website operator was not subject to general personal jurisdiction when Georgia users made up less than one percent of operator's users and provided less than one percent of its revenues). Defendants have alleged no quantum of traffic from Georgia users at all, much less one sufficient to support a finding of continuous contact with this forum.

*4 Rather, Defendants rely on conclusory allegations of such contacts "based upon information and belief" alone and argue that such allegations entitle them to further jurisdictional discovery. (Defendants' First Amended Counterclaims ¶¶ 9–11; Dkt. No. [68] at 8). However, Defendants' factual allegations fail to suggest "with reasonable particularity" the possible existence of the requisite "contacts between [the party] and the forum state" necessary to justify such jurisdictional discovery. *See Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 456 (3d Cir.2003); *see also Jazini v. Nissan Motor Co., Ltd.,* 148 F.3d 181, 185–86 (2d Cir.1998) (noting that allowing conclusory allegations to establish personal jurisdiction "would require the federal courts to conduct substantial jurisdictional discovery over foreign corporations-a practice in which they have not hitherto engaged").

As such, the Court declines to permit amendment to add a party where there is no indication that the Court would properly be able to exert personal jurisdiction over that party once it is added.

### Conclusion

For the aforementioned reasons, Defendants' Motion to Amend their Answer, Affirmative Defenses, and Counterclaims [60] is **GRANTED** in part and **DENIED** in part, and Plaintiff's Motion for Leave to File Surreply Brief [69] is **DENIED** as moot. Defendants are granted leave to amend their affirmative defenses to reflect the dismissal of Plaintiff's patent claims and to add claims under the Lanham Act and the Georgia Uniform Deceptive Trade Practices Act against existing Plaintiff, but are denied leave to join additional Counter–Defendants Schütz GmbH & Co. KGaA, Schütz–Werke GmbH & Co. KG, and Schütz Verwaltungs GmbH.

**SO ORDERED.**

Footnotes
1    Plaintiff's complaint originally included claims for patent infringement, which were dismissed by order of this Court on July 9, 2010. (*See* Dkt. No. [56] ).
2    Plaintiff seeks leave to file a surreply in further opposition to Defendants' motion to amend. (Dkt. No. [69] ). However, the Courts' ultimate holding obviates the need for any further briefing in opposition to Defendants' instant motion.

**End of Document**                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 18
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 18 of 41

Soroka v. Lee Technologies Services, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 1734277
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia,
Atlanta Division.

Joseph SOROKA, Plaintiff,
v.
LEE TECHNOLOGIES SERVICES, INC.,
f/k/a Lee Technologies Facility Wide
Service, Inc., Lee Technologies Group,
Inc., Lee Technologies, Inc., Defendants.

Civil Action File No. 1:06-
CV-0710-TWT.   |   June 19, 2006.

**Attorneys and Law Firms**

Aaron Ben Chausmer, Benjamin I. Fink, Berman Fink Van
Horn, Atlanta, GA, Harriet E. Cooperman, Saul Ewing, LLP,
Baltimore, MD, for Plaintiff.

Prescott Lane Nottingham, Office of Prescott L. Nottingham,
Atlanta, GA, for Defendant.

**Opinion**

## *OPINION AND ORDER*

THOMAS W. THRASH, JR., District Judge.

*1 This is a declaratory judgment action. It is before the
Court on the Defendants' Amended Motion to Dismiss or,
in the Alternative, to Transfer Venue or Stay Proceedings
[Doc. 10] and the Plaintiff's Motion for Expedited Ruling
on Defendants' Amended Motion to Dismiss or, in the
Alternative, to Transfer Venue or Stay Proceedings [Doc. 16].
For the reasons set forth below, the Defendants' Motion to
Transfer Venue is GRANTED, and the Plaintiff's motion is
GRANTED.

## I. BACKGROUND

Plaintiff Joseph Soroka, a resident of Georgia, is a former
employee of Defendants Lee Technologies, Inc. ("LTI")
and Lee Technologies Services, Inc. ("LTS"), formerly Lee
Technologies Facility Wide Service, Inc. LTI is in the
business of designing, developing, and monitoring computer

rooms and data centers as well as providing services
to support computer facilities. LTS is engaged in the
business of selling electrical and mechanical equipment and
integration services. Defendant Lee Technologies Group,
Inc. ("LTG") is the parent company of both LTI and LTS.
All three corporations are organized under the laws of the
Commonwealth of Virginia and have their principal place of
business in Fairfax, Virginia.

In February 1999, Soroka began working for LTI as a
sales manager. In 2000, Soroka was promoted to Director
of Technical Operations for LTS and was responsible for
developing and managing employees who provided technical
services to LTS customers. In connection with this position,
Soroka executed an Employment Agreement with LTS. The
Employment Agreement, which specifies that it is to be
governed by and construed in accordance with Virginia
law, contains a number of restrictive employment covenants.
Specifically, Paragraph 5.2 provides, in pertinent part:

> The Employee agrees to preserve
> and protect the confidentiality of
> Confidential Information both during
> and after employment with the
> Corporation [1]. In addition, the Employee
> agrees not to, at any time during the
> term of the Employee's employment or
> thereafter: (1) disclose or disseminate
> Confidential Information to any third
> party ...; (2) remove Confidential
> Information from any of the Corporation
> premises or make copies of Confidential
> Information ...; or (3) use Confidential
> Information for such Employee's own
> benefit or for the benefit of any third
> party.

(Verified Compl., Ex. A., ¶ 5.2.) Additionally, the non-
competition covenant of Paragraph 6.1 provides that:

> [W]hile employed by the Corporation
> and for a period of twelve (12) months
> thereafter, Employee will not engage
> or participate, directly or indirectly,
> as executive, Corporation, employee,
> contractor, partner or active owner, in the
> conduct or management of any business
> which is competitive with any business

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 19
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 19 of 41

Soroka v. Lee Technologies Services, Inc., Not Reported in F.Supp.2d (2006)

conducted by the Corporation at the date of Employee's termination.

(Verified Compl., Ex. A, ¶ 6. 1.) Finally, the non-solicitation provision, applicable during his employment and for 24 months thereafter, provided that Soroka would not:

> **\*2** (i) [D]irectly or indirectly ... interfere with, disrupt or attempt to disrupt the relationship, contractual or otherwise, between the Corporation, any of its customers, suppliers, manufacturers, (ii) directly or indirectly ... sell, offer to sell, or solicit any orders for the purchase of any products or services which compete with the Corporation's products or services to or from any person or entity which was a customer of the Corporation during the two (2) years preceding Employee's termination of employment with the Corporation....

(Verified Compl., Ex. A., ¶ 6.2.).

Soroka remained in his position with LTS until early 2002, at which time he began working as Director of Technical Sales Support for LTI and/or LTG. At that time, the Executive Vice President of LTG requested that Soroka execute an "Employee Non-Solicitation and Confidentiality Agreement" as well as an "Employment Agreement." Soroka asserts that he did not execute either. (Verified Compl. ¶¶ 24-26.) In the fall of 2004, Soroka again changed positions and began working for LTS as the Director of Technical Service. Soroka alleges that, as with his previous position, he did not execute any employment agreements or restrictive covenants with LTS or LTG when he began as Director of Technical Service. (Verified Compl. ¶ 28.) On February 3, 2006, Soroka notified LTS that he was resigning, effective on February 17, 2006. In a letter dated February 6, 2006, LTS advised Soroka that it was processing his termination effective immediately but that he would be credited two-weeks of pay through February 17th. According to Soroka, the letter also stated that he would be paid for all accrued but unused vacation leave and would be reimbursed for business-related expenses. (Verified Compl. ¶ 31.)

Subsequent to his resignation, Soroka accepted employment with VTC, LLC d/b/a Total Site Solutions ("Total Site").

(Verified Compl. ¶¶ 32, 35.) Total Site is engaged in the business of designing, developing, and maintaining data centers and mission critical facilities and providing services to support computer facilities for businesses, governmental, and other entities. Soroka concedes that Total Site may compete with the Defendants. (Verified Compl. ¶ 33.) On March 16, 2006, after learning of Soroka's employment with Total Site, the Defendants sent Soroka a cease-and-desist letter notifying Soroka that they believed him to be in violation of the non-competition, non-solicitation, and confidentiality provisions of the Employment Agreement. The Defendants further advised Soroka that if he did not immediately discontinue his allegedly improper activities, the Defendants would initiate legal action to enforce the Employment Agreement. (Verified Compl., Ex. D.)

Shortly after receiving the Defendants' cease-and-desist letter, Soroka filed this declaratory judgment action, seeking a declaration that the restrictive covenants set forth in the Employment Agreement violate Georgia public policy and are, therefore, void and unenforceable as a matter of law. Soroka seeks an interlocutory and permanent injunction, enjoining the Defendants from enforcing the restrictive covenants or from benefitting from their enforcement. Lastly, Soroka asserts a claim for breach of contract based on the Defendants' alleged failure to pay the two-weeks salary, unused vacation time, and incurred expenses as promised in the February 6, 2006 letter. Less than two weeks after Soroka filed this action, the Defendants filed suit in the Circuit Court of Fairfax County, Virginia, asserting claims for, among other things, breach of the non-competition agreement and breach of the non-solicitation agreement. (Defs.' Am. Mot. to Dismiss, Ex. 1.) Soroka subsequently removed that case to the United States District Court for the Eastern District of Virginia. The Defendants now move to dismiss this suit, arguing that a similar action is pending in Virginia and that Soroka improperly filed this declaratory judgment action merely in anticipation of the Defendants' suit. The Defendants move, in the alternative, to transfer venue to the Eastern District of Virginia or stay the proceedings pending resolution of the related action.

## II. *DISCUSSION*

**\*3** The Declaratory Judgment Act grants federal courts discretion to award declaratory relief in cases otherwise within their jurisdiction. 28 U.S.C. § 2201. Declaratory relief is appropriate where the judgment will "serve a useful

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 20
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 20 of 41

Soroka v. Lee Technologies Services, Inc., Not Reported in F.Supp.2d (2006)

purpose in clarifying and settling the legal relationships in issue [or] ... will terminate and afford relief from uncertainty, insecurity, and controversy giving rise to the proceeding." *Aetna Cas. & Sur. Co. v. Sunshine Corp.*, 74 F.3d 685, 687 (6th Cir.1996); *Continental Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir.1992); *Guerra v. Sutton*, 783 F.2d 1371, 1375 (9th Cir.1986). A district court has substantial discretion in deciding whether to entertain a declaratory judgment action, even if the action properly falls within the court's jurisdiction.

> By the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants. Consistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment before trial or after all arguments have drawn to a close.

*Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). The Eleventh Circuit Court of Appeals has stated that "[i]n its discretion, a district court may decline to entertain a declaratory judgment action on the merits when a pending proceeding in another court will fully resolve the controversy between the parties." *Ven-Fuel, Inc. v. Department of the Treasury*, 673 F.2d 1194, 1195 (11th Cir.1982). The Defendants argue that the Court should exercise its discretion to dismiss this declaratory judgment action because it was initiated solely in anticipation of the suit to enforce the restrictive covenants pending in the Eastern District of Virginia. In the alternative, the Defendants move to transfer venue to the Eastern District of Virginia. Because the Court finds that dismissal would not be as judicially efficient under the circumstances, it will limit its discussion to the propriety of transfer under 28 U.S.C. § 1404(a).

Motions to transfer venue are governed by 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Determining the propriety of transferring venue is a two-step inquiry. First, transfer under Section 1404(a) is limited to courts where the action might have been brought initially. *See Hoffman v. Blaski*, 363 U.S.

335, 343–44 (1960). Next, the district court must determine whether the action should be transferred for the convenience of the parties and in the interest of justice. In making this determination, the court is vested with broad discretion. *England v. ITT Thompson Indus., Inc.*, 856 F.2d 1518, 1520 (11th Cir.1988); *Ramsey v. Fox News Network, LLC*, 323 F.Supp.2d 1352, 1355 (N.D.Ga.2004). The burden is on the moving party to show that the balance of conveniences weighs in favor of the transfer. *In re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir.1989).

**\*4** The threshold inquiry for a Section 1404(a) transfer is whether the transferee court is a district where the action originally might have been brought. A civil action where jurisdiction is based upon diversity of citizenship may be brought in a judicial district: (1) where any defendant resides, if all defendants reside in the same State; (2) where a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject of the action is situated; or (3) where any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought. 28 U.S.C. § 1391(a). The Defendants assert that their principal place of business, and thus, where they "reside", is located Fairfax, Virginia. *See* 28 U.S.C. § 1391(c) ("For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced."); 28 U.S.C. § 1332(c)(1) ("[A] corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business...."). Accordingly, the Defendants argue that this case should be transferred to the Eastern District of Virginia, which includes Fairfax, Virginia. Soroka does not appear to object to the Defendants' assertion. Therefore, for purposes of the transfer motion, the Court concludes that the Eastern District of Virginia constitutes a proper venue for this action.

The Court must next determine whether the balance of justice and convenience favors transfer. In doing so, courts consider various factors, including: (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 21
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 21 of 41

Soroka v. Lee Technologies Services, Inc., Not Reported in F.Supp.2d (2006)

interests of justice, based on a totality of the circumstances. *Manuel v. Convergys Corp.,* 430 F.3d 1132, 1135 n. 1 (11th Cir.2005); *Martin v. South Carolina Bank,* 811 F.Supp. 679, 685 (M.D.Ga.1992). The Defendants contend that these factors weigh in favor of transferring this case to the Eastern District of Virginia. For instance, the Defendants assert that all relevant documentary evidence and witnesses are located in Fairfax, Virginia. Soroka has not disputed this assertion. Additionally, according to the Defendants, Soroka's Employment Agreement, which contains a choice of law provision specifying application of Virginia law, was executed and substantially performed in Virginia.[2]

Although these factors alone may not be sufficient to warrant transfer under Section 1404(a), the Court finds that compelling reasons do exist. Ordinarily, a plaintiff's choice of forum is granted a great deal of deference. *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508 (1947) ("[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."); *In re Ricoh,* 870 F.2d at 573. However, the fact that a substantially similar action is pending currently in the transferee court counsels in favor of transfer because of the opportunity for consolidation and, thus, the conservation of judicial resources.[3] *See Carl v. Republic Sec. Bank,* No. 018981 CIVHURLEY, 2002 WL 32167730, *4 (S.D.Fla. Jan. 22, 2002); *Martin,* 811 F.Supp. at 685 ("Undoubtedly, the most compelling reason for transfer is that there are related proceedings pending in the [transferee district]."); *Chrysler Capital Corp. v.. Woehling,* 663 F.Supp. 478, 483 (D.Del.1987). Nevertheless, courts often apply the "first filed" rule, which provides that when actions involving nearly identical parties and issues are pending simultaneously in courts with concurrent jurisdiction, the court in which the first suit was filed should typically hear the case. *See Autonation, Inc. v. Whitlock,* 276 F.Supp.2d 1258, 1264 (S.D.Fla.2003); *Martin,* 811 F.Supp. at 686. But, the first filed rule is not applied mechanically and exceptions are made in compelling circumstances. *Manuel,* 430 F.3d at 1135. Compelling circumstances may be found where a declaratory judgment action is filed in anticipation of another suit and is being used for forum shopping purposes. *See id.* ("[O]ne equitable consideration ... is whether the ... action was filed in apparent anticipation of the other pending proceeding."); *Ven-Fuel, Inc.,* 673 F.2d at 1195 (affirming district court's dismissal of first filed anticipatory declaratory judgment action); *Amerada Petroleum Corp. v. Marshall,* 381 F.2d 661, 663 (5th Cir.1967)[4] (district court properly considered fact that declaratory judgment action was filed in anticipation of defendant's breach of contract action); *FMC*

*Corp. v. AMVAC Chem. Corp.,* 379 F.Supp.2d 733, 744 & n. 23 (E.D.Pa.2005) (collecting cases); *Z-Line Designs, Inc. v. Bell'O Int'l, LLC,* 218 F.R.D. 663, 665 (N.D.Cal.2003) (anticipatory declaratory judgment suits filed in response to indications from defendant of imminent suit are examples of forum shopping); *Heatron, Inc. v. Shackelford,* 898 F.Supp. 1491, 1494-95 (D.Kan.1995) (exception to first-filed rule may apply where declaratory judgment action is triggered by receipt of notice letter). In some instances, "the mere fact that a plaintiff filed its declaratory judgment action first does not give it a 'right' to choose a forum." *Patton Elec. Co. v. Rampart Air, Inc.,* 777 F.Supp. 704, 708 (N.D.Ind.1991) (citing *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.,* 819 F.2d 746, 749-50 (7th Cir.1987)). This is particularly true when there is evidence that the underlying motivation for the first-filed action is forum shopping. *See Schwarz v. National Van Lines, Inc.,* 317 F.Supp.2d 829, 833 (N.D .Ill.2004) ("[C]ourts refuse to enforce the first to file rule where forum shopping motivated the first-filed action or the first-filed action constitutes an 'improper anticipatory filing' made under threat of an imminent suit and asserting the mirror-image of that suit in another district."); *Barrington Group, Ltd. v. Genesys Software Sys., Inc.,* 239 F.Supp.2d 870, 873 (E.D.Wis.2003) (presumption of first-to-file rule "diminishes if the purpose of that first filing is simply to preempt the choice of venue").

**\*5** The Court finds that sufficient evidence exists to establish that Soroka was motivated by forum-shopping concerns and filed this action in anticipation of the suit subsequently filed by the Defendants. In this regard, the sequence of events is quite telling. On February 3, 2006, Soroka notified his employer that he was resigning. Soroka is aware that the Defendants have previously sought to enforce restrictive covenants against former employees. (Verified Compl. ¶ 36.) Despite this knowledge, Soroka took no action, legal or otherwise, to clarify the applicability of the provisions of the Employment Agreement until after notification by the Defendants of their intent to enforce the restrictive covenants. More specifically, Soroka did not file this action until March 27, 2006, just eleven days after receiving the cease-and-desist letter from the Defendants, which stated, in pertinent part:

It has come to our attention that you recently became employed by a direct competitor of Lee Technologies ... As a condition of your employment in this important and sensitive role, you executed written agreements with Lee Technologies Services, Inc. containing confidentiality, non-compete and non-solicitation provisions.

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 22
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 22 of 41

Soroka v. Lee Technologies Services, Inc., Not Reported in F.Supp.2d (2006)

---

...

We have already had one customer inform us that you visited with them recently in an attempt to convince them to utilize another company ... We also understand that you recently sent letters to a number of our customers informing them that you had left Lee Technologies and were now working for a competing firm ... This is a direct violation of the confidentiality and non-solicitation provisions contained in the written agreements you entered into with Lee Technologies.

...

We demand that you immediately discontinue in your use of Lee Technologies' confidential information and refrain from further attempts to disrupt our business relationships with our customers. *Should you persist in such activities, we will initiate legal action against you to ensure the enforcement of the written agreements. These legal proceedings will include the pursuit of injunctive relief, damages and other remedies provided by the agreements and available at law.*

(Verified Compl., Ex. D) (emphasis added). As promised in their letter, on April 7, 2006, the Defendants filed suit in Virginia, seeking enforcement of and damages related to the alleged breaches of the restrictive covenants.

Given the speed with which Soroka reacted in the face of the Defendants' explicit statement of imminent legal proceedings, it is evident that he was not acting to resolve uncertainty regarding the applicability of the restrictive covenants. Rather, Soroka filed this suit in anticipation of the Defendants' suit to enforce the restrictive covenants. In fact, Soroka acknowledges in his Verified Complaint that the Defendants had clearly and directly threatened an enforcement suit.

(Verified Compl. ¶ 39.) It is further evident from Soroka's conduct that he acted in an effort to secure his preferred forum before the Defendants, the allegedly wronged parties, could choose theirs. Under these circumstances, the Court finds that there exist compelling circumstances warranting an exception to the first-filed rule. *See Z-Line Designs,* Inc., 218 F.R.D. at 667 ("[W]here as here a declaratory judgment action has been triggered by a cease and desist letter, equity militates in favor of allowing the second-filed action to proceed to judgment rather than the first."); *Hanson PLC v. MetroGoldwyn-Mayer, Inc.,* 932 F.Supp. 104, 107 (S.D.N.Y.1996) (preemptive declaratory judgment action filed three days after cease and desist letter not given benefit of first-filed rule). Rather than exercise its discretion to dismiss Soroka's declaratory judgment action, because a substantially similar case is pending in the transferee district, the Court deems a transfer of venue to be more appropriate. The anticipatory nature of this action, particularly when considered in light of the similar pending suit and the convenience of the witnesses and documentary evidence, outweighs any convenience factors favoring venue in this district. As such, Defendants' motion to transfer venue to the Eastern District of Virginia is granted.

## III. *CONCLUSION*

**\*6** For the reasons set forth above, the Defendants' Amended Motion to Transfer Venue [Doc. 10] is GRANTED. The Clerk is directed to transfer this case to the United States District Court for the Eastern District of Virginia. The Plaintiff's Motion to Expedite Ruling on Defendants' Amended Motion to Dismiss or, in the Alternative, to Transfer Venue or Stay Proceedings [Doc. 16] is GRANTED.

SO ORDERED, this 19 day of June, 2006.

---

Footnotes

1    For purposes of Sections 5 and 6, which contain the relevant restrictive covenants, the term "Corporation" includes, among others, LTI, LTS, and any parent of those entities, i.e., LTG. (Verified Compl., Ex. A, ¶ 8.6.)

2    The Defendants maintain that Soroka agreed to litigate in Virginia based upon the choice of law provision. However, a choice of law provision is not the equivalent of a forum selection clause, and the Employment Agreement does not contain a forum selection clause specifying Virginia or any other venue.

3    Soroka concedes that the action pending in the Eastern District of Virginia "concerns the same facts, agreement, issues, and parties as does this case." (Pl.'s Resp. to Defs.' Am. Mot. to Dismiss at 9.)

4    In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

---

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 23
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 23 of 41

**Soroka v. Lee Technologies Services, Inc., Not Reported in F.Supp.2d (2006)**

---

**End of Document**                                   © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 24
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 24 of 41

Thomas v. Strange Engineering, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 993244
Only the Westlaw citation is currently available.
United States District Court,
S.D. Georgia,
Augusta Division.

Ennis E. THOMAS, Jr., Plaintiff,
v.
STRANGE ENGINEERING, INC., Defendant.

No. CV 111–074.   |   March 22, 2012.

**Attorneys and Law Firms**

A. Montague Miller, John B. Long, Tucker, Everitt, Long, Brewton & Lanier, PC, Augusta, GA, for Plaintiff.

Fred M. Valz, III, Charles M. McDaniel, Jr., Megan E. Boyd, Atlanta, GA, Benjamin L. Bedard, Laura E. Bedard, Roberts, Reynolds, Bedard & Tuzzio, PA, W. Palm Beach, FL, for Defendant.

**Opinion**

## ORDER

J. RANDAL HALL, District Judge.

**\*1** Presently pending before the Court is Strange Engineering, Inc.'s ("Defendant") Motion to Dismiss or, in the Alternative, Motion to Transfer Venue. (Doc. no. 9.) After a review of the Complaint and the affidavits provided by the parties, Defendant's motion is **GRANTED** to the extent set forth below.

### I. BACKGROUND

**A. Factual Background**
This case arises from the destruction of Ennis Thomas' ("Plaintiff") drag racing vehicle. Plaintiff is a professional drag racer, and Defendant is in the business of fabricating and assembling aftermarket automotive parts, including rear end assemblies. (Compl.¶¶ 1, 2.)

Plaintiff entered into a contract to purchase a Vehicle Rear End ("Rear End") welded and manufactured by Defendant. (*Id.* ¶ 4.) Defendant advertises its rear end assemblies as "professionally welded" and states that it "has been the

leader in driveline suspension for over 40 years by paying attention to detail." (*Id.* ¶ 3.) In deciding to purchase the Rear End, Plaintiff alleges that he relied upon Defendant's advertisements that suggested that Defendant was the foremost authority in building Rear Ends for drag racing vehicles. (*Id.* ¶ 6.) Instead of contacting Defendant directly, Plaintiff ordered the Rear End from the Tennessee office of Power–Pro Racing Products ("Power–Pro"). (McGivern Aff. ¶ 12.) Power–Pro is a distributor of aftermarket automotive parts marketed by numerous fabricators and assemblers. (*Id.* ¶ 13.) Upon receiving Plaintiff's request, Power–Pro contacted Defendant and ordered the Rear End. (*Id.* ¶ 14.)

Defendant fabricated and assembled the Rear End at its facility in Morton Grove, Illinois and shipped the product to Power–Pro's Tennessee office. (*Id.* ¶¶ 15, 16.) While the Rear End was en route to Tennessee, Power–Pro requested that Defendant ship it directly to Plaintiff. (*Id.* ¶ 17.) As a result, Defendant contacted the shipping carrier and rerouted the Rear End to Plaintiff's place of business in Grovetown, Georgia. (*Id.;* Compl. ¶ 10.)

Upon receiving the Rear End, Plaintiff attached it to his drag racing vehicle. (Compl.¶ 11.) On February 6, 2010, Plaintiff traveled from his home in Georgia to attend a drag race in Florida. During the race, his vehicle crashed after the weld on the Rear End fractured. (*Id.* ¶ 12.) The accident caused Plaintiff substantial injuries and destroyed his vehicle. (*Id.* ¶ 14.) Plaintiff alleges that Defendant's negligent manufacture of the Rear End caused the accident. (*Id.* ¶ 13.)

**B. Procedural Background**
On April 1, 2011, Plaintiff brought a negligence action against Defendant in the Superior Court of Columbia County. (*Id.* ¶ 12.) In his Complaint, Plaintiff alleges that Defendant is subject to personal jurisdiction in Georgia by virtue of the Georgia long arm statute, O.C.G.A. § 9–10–91. Specifically, Plaintiff asserts that Defendant is subject to personal jurisdiction in Georgia because Defendant transacted business in Georgia, committed acts that resulted in a tortious injury to Plaintiff in Georgia, solicited business in Georgia, and derived substantial revenue from goods used in Georgia. (*Id.* ¶ 1.)

**\*2** On May 20, 2011, Defendant removed the case to this Court on the basis of diversity jurisdiction. (Doc. no. 1.) Defendant subsequently filed the present motion to dismiss contending that this Court lacks personal jurisdiction. (Doc. no. 9.) In support of its motion to dismiss, Defendant

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 25
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 25 of 41

Thomas v. Strange Engineering, Inc., Not Reported in F.Supp.2d (2012)

submitted the affidavit of its General Manager John McGivern. (Doc. no. 9, Ex. 3.) This affidavit supports Defendant's argument that it does not have sufficient contacts with the state of Georgia to warrant the exercise of personal jurisdiction.

In opposition to Defendant's motion, Plaintiff submitted his own affidavit and the affidavit of David Turner, Chief Executive Officer for Turner's Automotive, Inc., a Georgia corporation that regularly orders parts from Defendant. According to Plaintiff, these affidavits demonstrate that Defendant is subject to personal jurisdiction in Georgia. Plaintiff also noted that no discovery had been conducted in the case and requested that this Court defer ruling on the motion to dismiss to allow the parties additional time to obtain affidavits and declarations. (Doc. no. 14 at 1–2.) This additional time would allow Plaintiff the opportunity to ascertain the full nature of Defendant's contacts with the state of Georgia and better respond to Defendant's argument that this Court is without jurisdiction.

After considering Defendant's request, the Court issued an Order permitting the parties to engage in limited jurisdictional discovery. (Doc. no. 22.) The parties were given forty-five (45) days from the date of the Order to file supplemental responses to Defendant's motion to dismiss. (Doc. no. 22.) Plaintiff, however, did not take advantage of the jurisdictional discovery and failed to supplement his response within the forty-five (45) day window. Therefore, this Court will now address Defendant's motion to dismiss and consider only the parties' original briefs and affidavits.

## II. MOTION TO DISMISS STANDARD

"In the context of a motion to dismiss for lack of personal jurisdiction in which no evidentiary hearing is held, the plaintiff bears the burden of establishing a prima facie case of jurisdiction over the movant, nonresident defendant." *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir.1988). The plaintiff establishes a prima facie case by presenting "substantial evidence ... of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions ..." *Walker v. Nations Bank of Florida*, 53 F.3d 1548, 1554 (11th Cir.1995). The facts presented in the plaintiff's complaint are taken as true to the extent they are uncontroverted. *Foxworthy v. Custom Trees, Inc.*, 879 F.Supp. 1200, 1207 n. 10 (N.D.Ga.1995). If, however, the defendant submits affidavits

challenging the allegations in the complaint, the burden shifts back to the plaintiff to produce evidence supporting jurisdiction. *Diamond Crystal Brands, Inc. v. Food Movers Intern., Inc.*, 593 F.3d 1249, 1257 (11th Cir.2010). If the plaintiff's complaint and supporting affidavits conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff. *Id.* (citing *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir.2002)).

*3 To determine whether a nonresident defendant is subject to personal jurisdiction in Georgia, the Court must perform a two-part analysis. *Id.* at 1257–58. First, the Court must decide whether the exercise of personal jurisdiction is proper under Georgia's long-arm statute. *Id.* Next, the Court must determine whether there are sufficient "minimum contacts" with the forum state to satisfy the Due Process Clause of the Fourteenth Amendment. *Id.; Int'l Shoe Co. v. Washington Office of Unemployment Comp. & Placement*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

The Eleventh Circuit has held that "the Georgia long-arm statute does not grant courts in Georgia personal jurisdiction that is coextensive with procedural due process," but instead "imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process." *Diamond Crystal Brands, Inc.*, 593 F.3d at 1259. "[C]ourts must apply the specific limitations and requirements of O.C.G.A. § 9–10–91 literally and must engage in a statutory examination that is independent of, and distinct from, the constitutional analysis to ensure that both, separate prongs of the jurisdictional inquiry are satisfied." *Id.* at 1263.

## III. DISCUSSION

Defendant contends that this Court should dismiss this case pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure because Defendant is not subject to personal jurisdiction in Georgia. In support of this argument, Defendant contends that it does not maintain any offices in the state of Georgia and does not have any employees who reside in Georgia. (McGivern Aff. ¶ 5.) Moreover, Defendant asserts that it is not domesticated in or authorized to do business in Georgia and does not manufacture goods in Georgia. (*Id.* ¶ 6.) Finally, Defendant contends that it does not regularly do or solicit business in Georgia and does not derive a substantial portion of its income from Georgia.[1] (*Id.* ¶¶ 7, 8.)

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 26
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 26 of 41

Thomas v. Strange Engineering, Inc., Not Reported in F.Supp.2d (2012)

Plaintiff, however, asserts that this Court has personal jurisdiction over Defendant pursuant to subsections (1), (2) and (3) of the Georgia long-arm statute. Plaintiff argues that a number of factors support the exercise of personal jurisdiction over Defendant. These factors include: (1) Defendant contracted with a Georgia resident, (2) Defendant advertises its products in catalogs that are distributed in Georgia, (3) Defendant attends drag races in Georgia and regularly promotes its products at these races, (4) Defendant maintains a facility in McDonough, Georgia, and (5) Plaintiff incurred medical expenses in Georgia. [2] Moreover, Plaintiff claims that exercising personal jurisdiction over Defendant comports with the due process requirements of the United States Constitution.

**A. Personal Jurisdiction Pursuant to the Georgia Long–Arm Statute**
As noted above, to determine whether it can exercise personal jurisdiction, the Court must first examine whether the exercise of personal jurisdiction is proper under Georgia's long-arm statute.

**1. *Subsections (2) and (3) of the Long–Arm Statute***
*4 Plaintiff asserts that this Court has personal jurisdiction over Defendant pursuant to subsections (2) and (3) of the Georgia long-arm statute. Under subsection (2), a nonresident defendant is subject to personal jurisdiction in Georgia if it "commits a tortious act or omission within this state." O.C.G.A. § 9–10–91(2). Plaintiff suggests that because the Rear End was defective when shipped to Georgia, the act occurred in Georgia. The Court does not agree. The clear language of subsection (2) requires that the nonresident defendant commit a tortious act *in the state of Georgia*. O.C.G.A. § 9–10–91(2). A tortious act occurs "where the allegedly negligent act or omission was made...." *Atlanta Propeller Svc., Inc. v. Hoffman GMBH & Co. KG*, 191 Ga.App. 529, 530, 382 S.E.2d 109 (1989); *See also Gust v. Flint*, 257 Ga. 129, 130, 356 S.E.2d 513 (1987) (reinstating the difference between subsections (2) and (3) established by the literal language of the long-arm statute). Here, the alleged negligent act occurred in Illinois where the Rear End was manufactured. Therefore, shipping a defective product to Georgia is not a sufficient basis for personal jurisdiction under subsection (2).

Plaintiff also contends that personal jurisdiction is proper under subsection (3) of the long-arm statute. Pursuant to subsection (3), personal jurisdiction exists if the defendant "commits a tortious injury in this state caused by an act or omission outside this state if the tortfeasor regularly does or solicits business, or engages in any other persistent course of conduct ... in this state." O.C.G.A. § 9–10–91(3). In support of his claim that subsection (3) applies, Plaintiff sets forth numerous factors to establish that Defendant engaged in a persistent course of conduct in Georgia. The Court, however, need not address these factors because Defendant did not commit a tortious injury in Georgia, and therefore subsection (3) is inapplicable.

Plaintiff contends that the injury occurred in Georgia because he underwent medical treatment in the state following his accident and therefore suffered an economic injury in Georgia. This argument is without merit. The Georgia Court of Appeals has held that a tort occurs where the actual injury takes place and not where the economic consequences of the injury arise. *Gee,* 259 Ga.App. at 897, 578 S.E.2d 575 (citing *Atlanta Propeller Svc., Inc.,* 191 Ga.App. at 530, 382 S.E.2d 109); *see also Turley v. Vaudeville Cafe, LLC,* No. 1:10–cv–2284, 2011 WL 3844361, at *2 (N.D.Ga. Aug.26, 2011) (holding no personal jurisdiction in Georgia because plaintiff was served contaminated food in Tennessee and only suffered economic consequences in Georgia). Thus, suffering economic consequences in Georgia is insufficient for purposes of subsection (3).

**2. *Subsection (1) of the Long–Arm Statute***
Plaintiff also contends that jurisdiction is proper under subsection (1) of the long-arm statute because Defendant transacted business in the state. The Georgia long-arm statute, O.C.G.A. § 9–19–91, provides in relevant part:

*5 A court of this state may exercise personal jurisdiction over any nonresident or his or her executor or administrator, as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he were a resident of this state, if in person or through an agent, he or she:

(1) Transacts any business within this state.

O.C.G.A. § 9–19–91(1). To meet the "transacts any business" prong of the Georgia long-arm statute, a nonresident defendant must purposefully do some act or consummate some transaction in Georgia. *Diamond Crystal Brands, Inc.,* 593 F.3d at 1260 (citing *Aero Toy Store, LLC v. Grieves,* 279 Ga.App. 515, 517, 631 S.E.2d 734 (2006)).

Thomas v. Strange Engineering, Inc., Not Reported in F.Supp.2d (2012)

Based on the record before the Court, it is clear that, under a literal interpretation of the long-arm statute, Defendant transacted business in Georgia. Defendant shipped a product to Georgia and derived revenue from the sale of that product. Nothing in subsection (1) of the long-arm statute "requires the physical presence of the nonresident in Georgia or minimizes the import of a nonresident's intangible contacts with the State." *Innovative Clinical & Consulting Servs., LLC. v. First Nat'l Bank of Ames,* 279 Ga. 672, 673–75, 620 S.E.2d 352 (2005). Therefore, while Defendant lacks a physical presence in Georgia, its intangible contacts are sufficient to satisfy the requirements of § 9–10–91(1).

**B. Constitutional Requirements**

Having found that Georgia's long-arm statute permits the exercise of personal jurisdiction, the Court must now address the due process component of the jurisdictional analysis. "The Due Process Clause protects an individual's liberty interest in not being subject to binding judgments imposed by foreign sovereigns." *Diamond Crystal Brands,* 593 F.3d at 1267. Due process requires that (1) a nonresident defendant has certain minimum contacts with the forum state and (2) the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." *Id.*

To satisfy the minimum contacts analysis, Plaintiff must demonstrate that Defendant "purposefully availed" itself to the protection and laws of the state of Georgia, such that it "should reasonably anticipate being haled into court" here. *Id.* At the heart of the inquiry is the notion of "fair warning." *Id.* The fair warning requirement is met when a nonresident defendant "deliberately engage[s] in significant activities within [the forum] state or create[s] continuing obligations with residents of the forum." *Id.* at 1268 (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 480, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). Put differently, Defendant must purposefully establish contacts with the forum state, and there must be a significant nexus between those contacts and the litigation. *Id.* at 1267.

Here, Defendant is a foreign corporation that is not licensed to do business in Georgia and does not have offices or employees in Georgia. Although Defendant sold a Rear End to a Georgia resident, this transaction, without more, is insufficient to satisfy the due process requirements. In *Diamond Crystal Brands,* the Eleventh Circuit noted that entering a contract with a citizen of another state, standing alone, does not automatically satisfy the minimum

contacts test. *See also Burger King,* 471 U.S. at 478–79. Instead, when inspecting the contractual relationship for minimum contacts, courts must focus on the substance of the transaction including prior negotiations, contemplated future consequences, the terms of the contract, and the actual course of dealing. *Id.* The focus must be on whether the nonresident defendant engaged in significant activities within a state or created continuing obligations with residents of the forum. *Id.* (citing *Burger King,* 471 U.S. at 480). This focus ensures that a defendant will not be subject to jurisdiction based solely on "random," "fortuitous," or "attenuated" contacts. *Burger King,* 471 U.S. at 475 (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984))

**\*6** The sale of the Rear End appears to be an isolated transaction in the state of Georgia. Plaintiff failed to present any evidence suggesting that Defendant regularly contracts with Georgia residents. In fact, based on the evidence before the Court, it does not appear that there were any direct negotiations or a history of other dealings between Plaintiff and Defendant. Instead, Plaintiff ordered the Rear End from Power–Pro's offices in Tennessee, and Power–Pro contacted Defendant in Illinois. This is not a case where Defendant reached out to a Georgia resident or had knowledge at the time of contracting that the product would reach Georgia. The only portion of the contract that involved the state of Georgia was the shipment of the product to Plaintiff's principal place of business in Grovetown, Georgia. Shipment, however, cannot be the basis for personal jurisdiction. *See Francosteel Corp. v. M/V Charm, Tiki, Mortensen & Lange,* 19 F.3d 624, 628 (11th Cir.1994) (finding that the only connection Defendant had to Georgia was delivery of cargo in Georgia which is not enough to establish personal jurisdiction) (overruled on other grounds); *Baynes v. Mason Funeral Home,* No. 1:07–cv–2805, 2008 WL 5191808, at \*3 (N.D.Ga. Dec.10, 2008) (holding that there was no specific jurisdiction based on the single contract which requirement shipment to Georgia).

Construing all justifiable inferences in favor of Plaintiff, aside from the sale of the Rear End to Plaintiff, the only contacts Defendant had with the state of Georgia were its advertisements and the fact that Defendant attended drag races in Georgia.[3] However, these contacts cited by Plaintiff are exactly the type of "fortuitous" and "attenuated" contacts that do not satisfy due process. According to Plaintiff, "[c]atalogs such as the Summit Catalog advertise the Defendant's parts and those catalogs are sent to and utilized by Georgia residents." (Doc. no. 14 at 2.) Defendant

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 28
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 28 of 41

Thomas v. Strange Engineering, Inc., Not Reported in F.Supp.2d (2012)

presented evidence that while it does sell some products to Summit, it does not have any agreement with Summit regarding where its products are sold or how its products are advertised. (McGivern Supp. Aff. ¶¶ 3, 5.) There is nothing to indicate that Defendant pays Summit to advertise its products and therefore nothing to suggest that Defendant purposefully directs its advertisements at Georgia residents or actively solicits sales within Georgia.

Additionally, Defendant admits that it is part of a National Hot Rod Association ("NHRA") contingency program whereby it pays a racer a small contingency fee if the racer uses Defendant's parts, displays stickers indicating that the vehicle contains Defendant's parts, and wins a race. (*Id.* ¶ 9.) However, this is a nationwide program that is not Georgia specific, and the only knowledge Defendant has regarding whether its parts are used at races in Georgia comes after such use when Defendant is notified by the NHRA that fees are owed to the drivers. (*Id.*) Thus, like the advertisements in the Summit catalog, there is nothing to suggest that Defendant's participation in the contingency program was an effort to directly target Georgia residents. Furthermore, Plaintiff failed to present any evidence establishing a substantial nexus between Defendant's participation in the contingency program and the current lawsuit. As such, the advertisements and contingency program cannot be the basis of personal jurisdiction. *See Butler v. Beer Across America,* 83 F.Supp.2d. 1261, 1267 (N.D.Ala.2000) (finding that defendant's advertisements did not specifically target Alabama residents and therefore were not a basis for personal jurisdiction); *Baynes,* 2008 WL 519808, at *3 (finding that business did not advertise in Georgia for the purpose of personal jurisdiction when its name appeared in national funeral home directories).

*7 Moreover, Plaintiff cannot rely on Defendant's attendance at Georgia drag races to establish personal jurisdiction. Plaintiff stated that Defendant "has it trailers or personnel present at various races in the State of Georgia ... marketing its products." (Thomas Aff. ¶ 6.) However, Defendant rebutted Plaintiff's broad assertion with evidence that in the last five years, Defendant only attended one racing event in the state of Georgia, which occurred in April of 2009. Attending this single race cannot amount to "significant activity" and thus does not provide the minimum

contacts necessary to satisfy the due process requirements.[4] Additionally, Plaintiff failed to present evidence that he purchased the Rear End from Defendant at the 2009 race, or that he learned of Defendant's products at the race. Thus, even if this one race was enough to satisfy the minimum contacts analysis, there is no evidence to suggest a nexus between Defendant's attendance at the 2009 race and the current lawsuit.

In short, Plaintiff has failed to establish a prima facie case of personal jurisdiction over Defendant because Defendant's contacts with Georgia are too attenuated to satisfy the minimum contacts analysis. To exercise such jurisdiction would violate Defendant's rights under the Due Process Clause of the Fourteenth Amendment.[5]

### C. Transfer Venue

Defendant also requests a transfer of venue to the Middle District of Florida, the place where the accident occurred. Pursuant to 28 U.S.C. § 1406(a), even if the Court lacks personal jurisdiction, it may correct venue and jurisdictional defects through the transfer of venue. *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 466, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962) ("The language of 29 U.S.C. § 1406(a) is amply broad enough to authorize the transfer of cases, however wrong the plaintiff may have been in filing his case as to venue, whether the court in which it was filed had personal jurisdiction over the defendants or not.") Therefore, given the Court's lack of personal jurisdiction over Defendant and the fact that a substantial part of the events giving rise to the negligence claim occurred in another state, the case should be transferred to the United States District Court for the Middle District of Florida.

### IV. CONCLUSION

For the foregoing reasons, Defendant's motion (doc. no. 9) is **GRANTED.** The Clerk is **DIRECTED** to **TRANSFER** this action to the United States District Court for the Middle District of Florida and **CLOSE** this case.

**ORDER.**

Footnotes

1       According to Defendant, only about 1% of its sales are made to Georgia residents.

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 29
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 29 of 41

Thomas v. Strange Engineering, Inc., Not Reported in F.Supp.2d (2012)

2    Plaintiff also argues that Defendant garners substantial revenue from the sale of its products to Georgia residents. In support of this argument, Plaintiff employs a self-created "formula" for calculating Defendant's revenue from sales to Georgia residents. Specifically, using this "formula," Plaintiff asserts that "based on the fact that Georgia is the ninth (9th) most populated state; that Georgia's population is 9,687,663 or over 3% of the total population of the United States; and based upon the popularity of racing of all types in Georgia, [Plaintiff] believes that [Defendant] has more than sufficient contacts with the state of Georgia" to support the exercise of personal jurisdiction. (Thomas Aff. ¶ 8.)

The Court did not utilize Plaintiff's "formula" when considering Defendant's contacts with the state because the "formula" is based solely on conjecture. Plaintiff failed to present any evidence substantiating his calculations. Moreover, Plaintiff relied on his "formula" because "without discovery, he [could not] say with certainty ... what percentage of [Defendant's] sales occur with residents of Georgia." (*Id.*) If Plaintiff believed that a substantial amount of Defendant's sales came from Georgia residents, he was free to explore that assertion by conducting jurisdictional discovery. Because he failed to take advantage of the limited discovery period or supplement his briefs, the Court is unwilling to consider his unsubstantiated "formula" when determining whether Defendant derived substantial revenue from the state of Georgia.

3    Plaintiff claims Defendant maintains a facility in McDonough, Georgia. Defendant, however, presented evidence that this facility is actually owned by Autosales, Inc. d/b/a Summit Racing Equipment ("Summit"), an Ohio corporation with its principal place of business in Ohio. (Doc. no. 16, Ex. A.) Defendant has no ownership interest in Summit nor does Summit own any interest in Defendant. The only relationship between the two companies is Summit's purchase of Defendant's products. Plaintiff failed to present any evidence to refute this claim.

Additionally, Plaintiff asserts that its engineering expert is located in Columbia, South Carolina and that Defendant had its expert inspect the vehicle in Columbia County, Georgia. The fact that an engineer is located in *South Carolina* is irrelevant to the inquiry of whether personal jurisdiction is proper in *Georgia.* Moreover, while Defendant's expert travelled to Georgia to inspect the vehicle following the accident, the minimum contacts analysis focuses on the relationship between Defendant and the forum state prior to the event in question. A subsequent inspection of the vehicle does not support the assertion that Defendant engaged in significant activities with the state of Georgia prior to the incident giving rise to the current suit.

4    It appears from the affidavits before the Court that an employee of Defendant may have attended a Georgia drag race in April of 2011. To consider this contact would ignore the concept of specific jurisdiction and the clear mandate of Georgia's long-arm statute which require that the injury "arise out of" Defendant's contacts with the state. Because the injury occurred in the year prior to Defendant's attendance at the 2011 race, it cannot be said that the injury "arose out of" this contact.

5    Plaintiff asserts that *Diamond Crystal Brands* supports his position that the Court has personal jurisdiction over Defendant. It does not. In that case, the Eleventh Circuit found that Defendant established sufficient minimum contacts "when it purposely carried on a substantial and ongoing relationship with a Georgia manufacturer, specified delivery by "customer pickup" in Savannah, and sent payments to Savannah of twelve or fourteen transactions." *Id.* at 1268. The Eleventh Circuit further noted that "each individual transaction involved meaningful contact with Georgia, and, by purposefully engaging in fourteen transactions in just six months, [Defendant] established a substantial and ongoing relationship with a Georgia manufacturer." *Id.* at 1269. Under the present facts, there is simply no similar evidence of a substantial and ongoing relationship necessary to establish personal jurisdiction.

Plaintiff also relies on the Georgia Court of Appeals decision in *Aero Toy Store.* However, the facts of that case are distinguishable from the present suit. In that case, the court held that while the defendant did not have officers, employees, offices, or business affiliates in Georgia, and although it did not derive substantial revenue from Georgia, it *regularly solicited business* in Georgia through the internet. Here, there is no evidence that Defendant solicited business in Georgia. The only evidence of solicitation is the placement of Defendant's products in the Summit catalogs, which, as noted above, does not establish that Defendant actively sought out sales from Georgia residents.

---

**End of Document**               © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Trading Technologies Intern., Inc. v. CQG, Inc., Not Reported in F.Supp.2d (2005)

2005 WL 3601936
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

TRADING TECHNOLOGIES
INTERNATIONAL, INC., Plaintiff,
v.
CQG, INC., and CQGT, LLC, Defendants.

No. 05 C 4811.  |  Oct. 31, 2005.

**Attorneys and Law Firms**

Paul H. Berghoff, Dennis David Crouch, George I. Lee, Jennifer M. Kurcz, Leif R. Sigmond, Jr., Matthew J. Sampson, Stephen Richard Carden, McDonnell, Boehnen, Hulbert & Berghoff, Ltd., Steven F. Borsand, Trading Technologies International, Inc., Chicago, IL, for Plaintiff.

Jared B. Briant, Mark W. Fischer, Faegre & Benson, LLP, Boulder, CO, Robert B. Breisblatt, Welsh & Katz, Ltd., Chicago, IL, for Defendants.

**Opinion**

### MEMORANDUM OPINION AND ORDER

JAMES B. MORAN, Senior Judge.

**\*1** Defendants motion to dismiss for improper venue pursuant to FED.R.CIV.P. 12(b)(3), or, in the alternative, to transfer venue pursuant to 28 U.S.C. 1404(a) is denied. Status hearing is set for 11/30/2005 at 9:15 a.m.
[For further detail see attached order.]

Plaintiff Trading Technologies International, Inc. ("Trading Tech") brought an action alleging patent infringement against defendants CQG, Inc. and CQGT, LLC. Defendants move to dismiss for improper venue pursuant to FED. R. CIV. P. 12(b)(3), or, in the alternative, to transfer venue pursuant to 28 U.S.C. § 1404(a). For the reasons set forth below, we deny defendants' motion to dismiss or transfer.

### BACKGROUND

Defendants move to dismiss this claim for improper venue. In analyzing such a claim, we take all allegations in the complaint as true unless contradicted by defendants' affidavits, wherein we must resolve all factual conflicts and draw all reasonable inferences in favor of plaintiff. *Interlease Aviation Investors II (Aloha) L.L.C. v. Vanguard Airlines, Inc.,* 262 F.Supp.2d 898, 913 (N.D.Ill.2003). Additionally, we may examine facts outside of the complaint. *Id.* It is plaintiff's burden to establish proper venue. *Id.*

Defendants contend that venue is improper in the Northern District of Illinois because defendants first filed a declaratory action on infringement and validity of the same patents in the federal district court for the District of Colorado. In light of this claim, the time line of negotiation and litigation is of the foremost importance.

Plaintiff currently owns U.S. Patent Nos. 6,766,304 and 6,772,132 (both for "Click Based Trading with Intuitive Grid Display of Market Depth"). Plaintiff alleges that defendants have and continue to infringe such patents by making, using, selling, and/or offering for sale products and methods covered by claims of those patents in violation of 35 U.S.C. § 271. Commencing in July 2005, the parties engaged in discussion and negotiation to resolve any patent disputes between them. They discussed a communication schedule to form a structure for the negotiations. Plaintiff initially suggested a communication deadline of August 12, 2005, but eventually agreed to an August 19, 2005, deadline (Geannopulos aff. ¶ 13; Fischer aff. ¶ 4). The parties dispute the tenor of the discussion, plaintiff describing cooperative and forward-moving negotiation, and defendants depicting threatening and onerous conversations.

On August 17, 2005, the parties conversed about the most recent proposals. According to plaintiff, defendants turned down plaintiff's most recent proposal, but did not oppose further discussions with plaintiff's CEO, and agreed to continue working on the agreement that night (Gennopulos aff. ¶¶ 15-17). Defendants deny agreeing to continue such discussions, stating that they "made it clear that all discussions were over" as of the refusal of plaintiff's offer (Fischer aff. ¶ 5). Thereafter, on August 17, 2005, defendants filed a declaratory judgment action to resolve any obligations between the parties in the federal district court for the District of Colorado. Such action is currently pending. Plaintiff was taken by surprise at the commencement of defendants' suit, stating that "[a]t the time that CQG filed its Colorado declaratory judgment action against TT on August 17, 2005, I was under the impression that the negotiation schedule the parties had agreed to was still in place and that negotiations

Case No. 1:13-cv-01493-PAB-KLM Document 19-8 filed 07/03/13 USDC Colorado pg 31
of 41
Case 1:13-cv-01901-JOF Document 8-7 Filed 07/03/13 Page 31 of 41

Trading Technologies Intern., Inc. v. CQG, Inc., Not Reported in F.Supp.2d (2005)

would continue until at least August 19, 2005" (Gennopulos aff. ¶ 18). Because this is Rule 12(b)(3) motion, and there is significant dispute as to the nature and termination of the negotiation, we resolve the above disputes in favor of the plaintiff.

### DISCUSSION

**\*2** Venue is proper "in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b). Thus, because defendants have an established place of business in Illinois and a principal place of business in Colorado, venue would be proper in either district.

Defendants argue, however, that this case should be dismissed for improper venue "in light of Defendants' first-filed declaratory judgment action in the District of Colorado which involves the same parties and addresses the very same issues in this action." (defs' mot. at 3). In order to save judicial resources and provide consistent judgment, two identical lawsuits should not proceed in federal courts in two different districts. The general rule is that the case first filed takes priority, and the subsequently filed suit should be dismissed or transferred. *Schnadig Corp. v. Collezione Europa U.S.A.,* 2001 WL 766898, \*1 (N.D.Ill.2001); *Design Automotive Group, Inc. v. Lund Industries, Inc.,* 1996 WL 377063, \*1-2 (N.D.Ill.1996); *Colborne Corp. v. Mc Retail Foods,* 1995 WL 470226, \*1 (N.D.Ill.1995). This rule applies even where the first filed action is a suit for declaratory judgment. *Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931, 937-38 (Fed.Cir.1993); *Design Automotive Group, Inc. v. Lund Industries, Inc.,* 1996 WL 377063, \*1-2 (N.D.Ill.,1996). In patent infringement actions the Federal Circuit has strongly endorsed the first-to-file doctrine. [1] *See Genetech,* 998 F.2d 931; *Electronics for Imaging, Inc. v. Coyle,* 394 F.3d 1341 (Fed.Cir.2005). In fact, the Federal Circuit explicitly rejected applying *Tempco Electric Heather Corp. v. Omega Engineering, Inc.,* 819 F.2d 746, 749 (7th Cir.1987)(holding that where "the declaratory judgment action is filed in anticipation of an infringement action, the infringement action should proceed, even if filed four days later"), to patent actions. Rather, the Federal Circuit found that consideration of anticipatory filing and preemption of another's suit is only one factor in determining whether to dismiss a declaratory judgment action in favor of a subsequently filed patent infringement suit involving a

same parties and patents. *Electronics for Imaging, Inc.,* 394 F.3d at 1347-48.

Because the Federal Circuit does not counsel "rigid mechanical solutions" to venue and jurisdiction problems (*Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 96 L.Ed. 200 (1952)), we consider other factors: convenience and availability of witnesses, absence of jurisdiction over all necessary or desirable parties, possibility of consolidation with related litigation, considerations relating to the real party in interest (*Genetech, Inc.,* 998 F.2d at 938) and the underlying purposes of the Declaratory Judgment Act. *See EMC Corp. v. Norand Corp.,* 89 F.3d 807, 814 (Fed.Cir.1996) (finding that the special flexibility granted district courts in declaratory judgment actions does not limit courts to decline jurisdiction only when special circumstances of convenience, jurisdiction or consolidation are present).

**\*3** First and foremost, we note that CQG's declaratory judgment filing appears to be a race to the courthouse in contravention of the purposes of the Declaratory Judgment Act. That Act states:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a).

Prior to the Declaratory Judgment Act, alleged patent infringers could not initiate legal proceedings to define their rights and obligations with regard to potential infringement. They were helpless to escape patentee's tactical maneuvering, whereby patentee hesitated in filing an infringement action solely to harass alleged infringer's customers or increase bargaining power. Allowing competitors to sue for declaratory judgment served to clear the air, protect their customers, and to define their rights without accumulating injuries related to waiting for patentee to decide whether to bring suit. *See EMC Corp.,* 89 F.3d at 814-15; *BP Chemicals Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 977 (The Act "accommodates the practical situation wherein the interests of one side to the dispute may be served by delay in taking legal action"). The Declaratory Judgment Act was not

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 32
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 32 of 41

Trading Technologies Intern., Inc. v. CQG, Inc., Not Reported in F.Supp.2d (2005)

intended to affix competitor with a right to feign negotiation in order to delay patentee's filing of an infringement suit in an effort to secure a preferable forum. In this case, defendants requested an extension of time for negotiation, then simultaneously terminated negotiations prior to that date and filed a declaratory judgment action. Although the Federal Circuit has found that commencing suit prior to a negotiation deadline should not deprive the alleged patent violator of the right to sue (*Electronics for Imaging, Inc.,* 394 F.3d at 1347), the Supreme Court noted that "[t]he manufacturer who is charged with infringing a patent cannot stretch the Federal Declaratory Judgments Act to give him a paramount right to choose the forum for trying out questions of infringement and validity. He is given an equal start in the race to the courthouse, not a headstart." *Kerotest Mfg.Co.,* 342 U.S. at 185. Thus, it appears to us that defendants were engaging in tactical strategies similar to the maneuvering the Declaratory Judgment Act was designed to end.

Second, the balance of conveniences weighs in favor of consolidating the suits in Illinois, not Colorado. Because both parties have offices in Chicago, and can access important documents from those offices, this weighs in favor of maintaining jurisdiction in Chicago. Defendant argues that plaintiff's situs for developing and maintaining its patented technology is irrelevant, stating that the focus in a patent infringement case is on "the activities of the alleged infringer, its employees, and its documents." (defs' reply at 9) (*citing Corp. Safe Specialists, Inc. v. Tidel Techs., Inc.,* 2005 WL 2124483, *2 (N.D.Ill.2005). While this is the general rule, defendants fail to note that this court in the same case found that "the weight of this factor is somewhat counterbalanced by [defendants'] declaratory judgment action, which indicates that they will call the validity of [plaintiff's] patent into question." *Corp. Safe Specialists, Inc.,* 2005 WL 2124483 at *2. Additionally, while defendants dispute plaintiff's statement that defendants' customer base in Chicago is greater than its customer base in Colorado, defendants do not dispute that they maintain an office in Chicago, generate 30 per cent of their revenue from the Chicago market, and manage some of those accounts from the Chicago office. Therefore, although it would be more convenient for defendants to litigate this case in Colorado, it would be less inconvenient for them to litigate in Chicago than it would be to force plaintiff to litigate in Colorado, where they have no office, no client base, and generate no revenue.

  *4 Third, we must consider the necessity of consolidating these actions. Generally, "[w]hen pending litigation involves

the same parties and similar legal, technical and infringement issues, transfer to that venue is logical and strongly favored." *Berol Corp. v. BIC Corp.,* 2002 WL 1466829, *5, n5 (N.D.Ill.2002). In this case, there is almost identical litigation pending in this court and in Colorado. The actions are following a similar time line, with essentially the same motion, fully briefed, awaiting decision by the courts. The Colorado complaint was filed on August 17, 2005, and on September 7, 2005, defendant Trading Tech made a motion to dismiss, transfer to the Northern District of Illinois, or stay. That motion was fully briefed as of October 12, 2005. In an almost identical time line, the complaint in this action was filed on August 19, 2005, defendant CQG made a motion to dismiss or transfer to the District of Colorado, and the motion was fully briefed as of October 13, 2005. As noted above, we do not believe that the Colorado action should proceed in lieu of this action simply because it was filed first. Therefore, because the facts of this case suggest rejection of the first-filed presumption, we risk engaging in a stalemate with the Colorado court, each waiting for the other court to make a determination of the motion to dismiss or transfer before attending to the mirror motion before it. Because defendant CQG did not make a motion to stay, we feel compelled to decide this motion on the facts before us. In doing so, we accept jurisdiction and believe that the Colorado court should transfer the related case to Illinois for consolidation with this case. [2]

Additionally, as plaintiff noted, seven additional related patent infringement actions are currently pending in the Northern District of Illinois, two of which are before this court. We agree that there is an efficiency benefit of maintaining all of the cases in the same district. Finally, we note that this court has jurisdiction over all parties to this action.

Based on the facts of the case before us, weighing the convenience of the parties and respecting the purposes of the Declaratory Judgment Act, we find that this case is properly heard before this court. Thus, we deny defendants' motion to dismiss. [3]

In analyzing a motion to transfer venue, we assess whether transfer would serve the convenience of the parties and witnesses and would be in the interests of justice. *See Santa's Best Craft, LLC v. Janning,* 2003 WL 21504522, *3 (N.D.Ill.2003). In making such an assessment we must consider the private interests of the parties and the public interests of the courts. *Georgouses v. NaTec Resources,*

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 33
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 33 of 41

Trading Technologies Intern., Inc. v. CQG, Inc., Not Reported in F.Supp.2d (2005)

*Inc.,* 963 F.Supp. 728, 730 (N.D.Ill.1997). Specifically, we should look at plaintiff's choice of forum, access to proof, availability and convenience of witnesses, situs of material events, convenience, each forum's interest in resolving the controversy, familiarity with applicable law, and court resources and congestion. *Id.* The defendants, as the moving party, bear the burden of demonstrating that a transfer to the District of Colorado is clearly more convenient. *Clearclad Coatings, Inc. v. Xontal, Ltd.,* 1999 WL 652030, *8 (N.D.Ill.1999). Based on the discussion above regarding the convenience of parties, access to proof, and possibility

for consolidation, we do not believe that the defendants have met that burden. Therefore, we deny defendants' motion to transfer venue.

### CONCLUSION

**\*5** For the foregoing reasons, defendants' motion to dismiss or transfer is denied.

Footnotes

1    Both parties agree that patent cases are bound by Federal Circuit, rather than regional circuit, law. *See Serco Services Co., L.P. v. Kelley Co., Inc.,* 51 F.3d 1037, 1038 (Fed.Cir.1995) ("The proper relationship between an action under this act for a declaration of patent rights and a later-filed infringement suit triggers this court's special responsibility to foster national uniformity in patent practice; we do not defer to the procedural rules of other circuits").

2    Unlike jurisdiction over coercive actions, a "district court is not required to exercise declaratory judgment jurisdiction, but has 'unique and substantial discretion' to decline that jurisdiction ." *Electronics for Imaging, Inc.,* 394 F.3d at 1345. *See also EMC Corp.,* 89 F.3d at 813 ("Simply because there is an actual controversy between the parties does not mean that the district court is required to exercise that jurisdiction").

3    Defendants spend a significant amount of time trying to convince this court that a case or controversy existed at the time of the filing of their declaratory judgment suit. Because we find that this district is the proper venue for determining the rights and obligations of the interested parties, it is unnecessary to determine whether there was a case or controversy upon filing of the declaratory judgment suit such that Colorado would have had jurisdiction.

---

**End of Document**                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 34
Case 1:13-cv-01901-JOE   Document 8-7   Filed 07/03/13   Page 34 of 41
of 41

Virgin Health Corp. v. Virgin Enterprises Ltd., 393 Fed.Appx. 623 (2010)

393 Fed.Appx. 623
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Eleventh Circuit Rules 36-2, 36-3. (Find
CTA11 Rule 36-2 and Find CTA11 Rule 36-3)
United States Court of Appeals,
Eleventh Circuit.

VIRGIN HEALTH CORPORATION, a
Florida corporation, Plaintiff-Appellant,
v.
VIRGIN ENTERPRISES LIMITED, an
English corporation, Defendant-Appellee.

No. 09-11438   |   Non-Argument
Calendar.   |   Aug. 19, 2010.

**Synopsis**
**Background:** Provider of home health care services brought
action against licensor of name "Virgin" for use in a
number of business enterprises, among them health insurance
and medical evaluation services, seeking a declaratory
judgment that its use of name "Virgin Health" and Internet
domain name virginhealth.net in connection with its services
did not amount to trademark infringement, cybersquatting,
and deceptive and unfair trade practices. The United
States District Court for the Southern District of Florida,
No. 08-22557-CV-UU, Ursula Ungaro, J., dismissed the
complaint. Provider appealed.

**Holdings:** The Court of Appeals held that:

[1] exercise of specific jurisdiction over licensor was not
warranted under Florida's long-arm statute, and

[2] exercise of general jurisdiction over licensor was not
warranted under Florida's long-arm statute.

Affirmed.

West Headnotes (5)

**[1]   Trademarks**
    Foreign commerce

Alien licensor of name "Virgin" for use
in a number of business enterprises, among
them health insurance and medical evaluation
services, did not carry on a business in Florida
by mailing cease-and-desist letter to provider
of home health care services in Florida, as
required for exercise of specific jurisdiction
over licensor under Florida's long-arm statute, in
provider's action seeking a declaratory judgment
that its use of name "Virgin Health" and Internet
domain name virginhealth.net in connection
with its services did not amount to trademark
infringement, cybersquatting, and deceptive and
unfair trade practices. West's F.S.A. § 48.193(1)
(a).

1 Cases that cite this headnote

**[2]   Trademarks**
    Foreign commerce

Licensor of name "Virgin" for use in a number
of business enterprises, among them health
insurance and medical evaluation services, was
not engaged in substantial activity in Florida,
as required for exercise of general jurisdiction
over licensor under Florida's long-arm statute, in
provider's action seeking a declaratory judgment
that its use of name "Virgin Health" and Internet
domain name virginhealth.net in connection
with its services did not amount to trademark
infringement, cybersquatting, and deceptive and
unfair trade practices, although its licensees
conducted activities in Florida, where licensor
itself had no office, employees, real property,
bank account, mailing address, or telephone
number in Florida, and it did not engage in
business or make any contracts in Florida. West's
F.S.A. § 48.193(2).

3 Cases that cite this headnote

**[3]   Trademarks**

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 35
Case 1:13-cv-01901-JOE   Document 44-7   Filed 07/03/13   Page 35 of 41
Virgin Health Corp. v. Virgin Enterprises Ltd., 393 Fed.Appx. 623 (2010)

⌦ Alphabetical listing
VIRGIN.

**[4]    Trademarks**
⌦ Alphabetical listing
Virgin Health.

**[5]    Trademarks**
⌦ Alphabetical listing
virginhealth.net.

**Attorneys and Law Firms**

**\*624**  Michael Keith Lipscomb, Lipscomb, Brady & Eisenberg, PL, Miami, FL, for Plaintiff-Appellant.

James W. Dabney, Fried, Frank, Harris, Shriver & Jacobson, LLP, New York, NY, for Defendant-Appellee.

Appeal from the United States District Court for the Southern District of Florida. D.C. Docket No. 08-22557-CV-UU.

Before MARCUS, WILSON and ANDERSON, Circuit Judges.

**Opinion**

PER CURIAM:

This case returns to us after the district court's review of its docket confirmed that the appellant Virgin Health Corporation **\*625** (VHC) timely filed its notice of appeal.[1] With the issue of our jurisdiction thus resolved, we now entertain VHC's request to reverse the district court's dismissal of its trademark and cyber-squatting declaratory judgment action against Virgin Enterprises Limited (VEL). The district court found that Florida's long-arm statute precluded the exercise of personal jurisdiction over VEL. After careful review, we affirm the judgment of the district court.

**I. Background**

This dispute between VHC and VEL is one of several that have played out in different forums concerning the parties' respective rights to use the term "Virgin Health" and its cognates in various marketing contexts. VHC, a Florida corporation, has provided home health care services in Miami-Dade and Palm Beach counties since at least November 2005. VEL, an English corporation, is part of the Virgin conglomerate based in London. VEL's sole function is licensing the use of the Virgin name to hundreds of subsidiaries that reveal the breadth of the conglomerate's interests: entertainment, aviation, tourism, cellular phones, and-most relevant to this case-health-related enterprises.

In February 2005, VEL filed applications with the U.S. Patent & Trademark Office to register its interest in the service mark "VIRGIN" for a number of business enterprises, among them health insurance and medical evaluation services. In late 2007, VEL sent VHC a letter asking it to cease using the name Virgin Health Corp., and to cease using the Internet domain name virginhealth.net, in connection with health care services. VEL noted that its licensee Virgin HealthMiles, Inc. was operating its own website, virginlifecare.com. VEL asked VHC to transfer the domain name virginhealth.net to VEL.

The conflict moved into the federal courts. In January 2008, VEL sued VHC and other defendants in New York, alleging trademark infringement and cybersquatting. VEL subsequently dismissed those claims against VHC. In September 2008, VHC filed the instant declaratory judgment action against VEL in the Southern District of Florida. The action sought relief in the form of three declarations: (1) VHC had not infringed VEL's trademarks in violation of Florida common law and the Lanham Act; (2) VHC had not cyber-squatted in violation of the Lanham Act; and (3) VHC had not violated the Florida Deceptive and Unfair Trade Practices Act. VHC also filed oppositions to VEL's pending applications with the federal trademark office, but it later moved for a stay in the trademark proceedings in order to prosecute its declaratory judgment claims in district court.

VHC served VEL in London. VEL moved to dismiss for lack of personal jurisdiction. On February 11, 2009, the district court entered an order dismissing VHC's case for lack of personal jurisdiction over VEL.

**II. Standard of Review**

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 36
Case 1:13-cv-01901-JOE   Document 3-7   Filed 07/03/13   Page 36 of 41
of 41
**Virgin Health Corp. v. Virgin Enterprises Ltd., 393 Fed.Appx. 623 (2010)**

We review *de novo* a district court's dismissal for lack of personal jurisdiction. *United Techs. Corp. v. Mazer,* 556 F.3d 1260, 1274 (11th Cir.2009) (citation omitted). The plaintiff bears the initial burden of alleging sufficient jurisdictional facts to make a prima facie case; if the defendant rebuts with contrary affidavit evidence, the **\*626** plaintiff reassumes the burden. *Id.* (citation omitted). The plaintiff establishes a prima facie case if it "presents enough evidence to withstand a motion for directed verdict." *Consol. Dev. Corp. v. Sherritt, Inc.,* 216 F.3d 1286, 1291 (11th Cir.2000) (citation omitted). A federal court typically applies a two-step test when analyzing personal jurisdiction over a nonresident defendant: whether the exercise of jurisdiction (1) comports with the long-arm statute of the forum state; and (2) does not violate the Due Process Clause of the Fourteenth Amendment. Fed.R.Civ.P. 4(k)(1)(A); *Mazer,* 556 F.3d at 1274 (citation omitted). The reach of the Florida long-arm statute is a question of Florida law; therefore, we must construe it as we believe the Florida Supreme Court would. *Id.* (citation omitted). In the absence of authority from the Florida Supreme Court, we look to the Florida district courts of appeal. *Id.* at 1274-75 (citation omitted).

### III. Discussion

[1]   On appeal, VHC alleges that VEL is subject both to specific and general jurisdiction in Florida. VHC further asserts that VEL's licensees are its agents capable of subjecting VEL to the district court's jurisdiction. Upon reviewing the first prong of the personal jurisdiction inquiry, we affirm the district court's finding that VHC failed to meet the requirements of Florida's long-arm statute. This conclusion makes it unnecessary for us to consider the second prong, constitutionality.

VHC's argument for specific jurisdiction under § 48.193(1), Fla. Stat., which requires that VHC's claims "aris[e] from" VEL's acts, rests on the cease-and-desist letter that VEL mailed from New York to VHC in Florida. VHC claims this letter qualifies VEL as "carrying on a business" in Florida under § 48.193(1)(a), Fla. Stat. We disagree. While sending a letter into Florida could invite specific jurisdiction under § 48.193(1)(b) if the letter itself is tortious, *Wendt v. Horowitz,* 822 So.2d 1252, 1260 (Fla.2002), the act of sending the letter, by itself, does not mean that VEL is doing business in Florida for purposes of § 48.193(1)(a). *Nida Corp. v. Nida,* 118 F.Supp.2d 1223, 1228 (M.D.Fla.2000); *Insight Instruments, Inc. v. A.V.I.-Advanced Visual Instruments, Inc.,*

44 F.Supp.2d 1269, 1272 (M.D.Fla.1999). While a demand letter frequently precedes a lawsuit, the letter here cannot be said to have given rise to VHC's claims.

[2]   As for general jurisdiction under § 48.193(2), Fla. Stat., VHC has not refuted VEL's proffer that VEL has no office, employees, real property, bank account, mailing address, or telephone number in Florida; and that it has not engaged in business or made any contracts in Florida. Nor does general jurisdiction apply to VEL because it filed an infringement suit in the Southern District of Florida in 2006. *See Gibbons v. Brown,* 716 So.2d 868, 870-71 (Fla. 1st DCA 1998) (per curiam).

VHC also contends that VEL's licensees, including Virgin HealthMiles, Virgin Atlantic Airways, Virgin Entertainment, Virgin Mobile, and Virgin Vacations, are VEL's agents capable of subjecting VEL to personal jurisdiction in Florida. VHC relies on the reference to an "agent" in § 48.193(1), Fla. Stat. To support a finding of agency, Florida courts require (1) acknowledgement by the principal that the agent will act for him; (2) acceptance by the agent; and (3) control by the principal over the actions of the agent. *Goldschmidt v. Holman,* 571 So.2d 422, 424 n. 5 (Fla.1990) (citation omitted).

VHC fails to satisfy this standard. Although VHC notes that VEL (1) negotiates licenses with licensees; (2) monitors the use of the licenses; (3) applies for and defends service marks; and (4) polices **\*627** against infringement of marks, none of this activity, nor the activity of the licensees as evidenced through screenshots of their online activity, demonstrates that the licensees are the agents of VEL. VHC's conclusory assertion that VEL has contractual veto power over the quality of its licensees' goods and services likewise fails to satisfy the test that would impute the licensees' activities to VEL for purposes of finding personal jurisdiction. Therefore, VHC has failed to show that the Florida long-arm statute permits the district court's assertion of personal jurisdiction over VEL.[2] We therefore do not reach the second question of the personal jurisdiction analysis: whether such an exercise of jurisdiction would be constitutional.

### IV. Conclusion

VHC has failed to show that Florida's long-arm statute permits personal jurisdiction over VEL; therefore, we affirm the judgment of the district court.[3]

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 37
of 41
Case 1:13-cv-01901-JOE   Document 8-7   Filed 07/03/13   Page 37 of 41
Virgin Health Corp. v. Virgin Enterprises Ltd., 393 Fed.Appx. 623 (2010)

**AFFIRMED.**

**Parallel Citations**

2010 WL 3273025 (C.A.11 (Fla.))

Footnotes

1    In an order dated November 13, 2009, this panel remanded the case to the district court to determine whether its docket showed that
VHC filed its notice of appeal within the thirty-day jurisdictional window of Federal Rule of Appellate Procedure 4(a)(1)(A). On
December 28, 2009, the district court entered its order correcting the docket. D.E. 43.

2    VHC pleaded, and the district court analyzed, the question of personal jurisdiction here as implicating Florida's long-arm statute.
But VHC might have argued personal jurisdiction under the so-called "federal long-arm" statute, Federal Rule of Civil Procedure
4(k)(2). *Oldfield v. Pueblo De Bahia Lora, S.A.,* 558 F.3d 1210, 1218 & n. 23 (11th Cir.2009) (citation omitted). The federal long-
arm statute can reach a foreign defendant that is not subject to the jurisdiction of the courts of general jurisdiction of any state, as
long as the plaintiff's claim arises under federal law and the exercise of personal jurisdiction would not offend Fifth Amendment due
process. *Id.* at 1218-19 (citing *Consol. Dev. Corp. v. Sherritt, Inc.,* 216 F.3d 1286, 1291 (11th Cir.2000)). VEL could have defeated
this theory by identifying a U.S. state in which it was subject to personal jurisdiction in a state court, *id.* at 1218 n. 22, or by showing
that its aggregated contacts with the United States as a whole were insufficient, *United States v. Swiss Am. Bank, Ltd.,* 191 F.3d
30, 41 (1st Cir.1999). Since the plaintiff bears the burden of pleading jurisdiction, we will not substitute our own theory for its.
Moreover, our general rule is not to review a theory that was not raised in the district court. *Wright v. Hanna Steel Corp.,* 270 F.3d
1336, 1342 (11th Cir.2001).

3    VHC's request for oral argument is denied.

---

**End of Document**                                           © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 38
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 38 of 41

Web.com, Inc. v. Go Daddy Group, Inc., Not Reported in F.Supp.2d (2007)

2007 WL 7035105
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia,
Atlanta Division.

WEB.COM, INC., Plaintiff,
v.
The GO DADDY GROUP, INC., Defendant.

Civil Action File No. 1:06–CV–
1461–TCB.    |    Aug. 3, 2007.

**Attorneys and Law Firms**

Edward A. Gordon, Edward J. Kelly, William L. Patton, Ropes & Gray, LLP, Boston, MA, J. Steven Baughman, Ropes & Gray, LLP, Washington, DC, John Gregory Perry, Womble Carlyle Sandridge & Rice, Atlanta, GA, for Plaintiff.

Benjamin F. Easterlin, IV, Gregory Keith Smith, King & Spalding, LLP, Atlanta, GA, Lucy Yen, Michael Brett Levin, Terrence Joseph Patrick Kearney, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, for Defendant.

**Opinion**

### ORDER

TIMOTHY C. BATTEN, SR., District Judge.

*\*1* This matter is before the Court on Defendant The Go Daddy Group, Inc.'s motion to dismiss Plaintiff Web.com, Inc.'s amended complaint for lack of personal jurisdiction and improper venue. [1]

### I. *Background*

Web.com is one of the country's leading web hosting companies, hosting over 170,000 websites. Web.com's corporate headquarters and principal place of business are located in Atlanta, Georgia.

Go Daddy is a privately-owned Internet domain registrar and website hosting company. Go Daddy is incorporated in Arizona, and its principal place of business is located in Scottsdale, Arizona. The gravamen of Web.com's complaint is that Go Daddy uses various web hosting technologies that infringe on Web.com's patent rights with respect to U.S. Patent Nos. 6,789,103, 6,842,769, 6,868,444, and 6,654,804.

At its Arizona headquarters, Go Daddy maintains a commercial website accessible to anyone with a computer and an Internet connection. On this website, visitors can learn about and order Go Daddy's web hosting services. Go Daddy's web hosting services enable customers to have a presence on the Internet, with Go Daddy hosting their websites on its servers in Arizona. Also accessible through its website, Go Daddy provides a control panel through which customers may manage their hosting accounts over the Internet. Go Daddy does not customize a customer's website, nor does it exercise control over or derive revenue from the content that customers place on their websites.

Go Daddy maintains all the equipment and software required to perform its website hosting services in Arizona. Likewise, Go Daddy's design, development, testing, and research efforts take place in Arizona.

Go Daddy has neither applied for nor obtained a license to do business in Georgia. It does not own real property in Georgia, it does not lease office space here, it has no Georgia-based employees, it does not own any financial accounts in Georgia, and it does not pay or have any obligation to pay taxes in the state. However, Go Daddy has approximately 72,000 customers who reside in Georgia, less than three percent of its total customer base.

### II. *Discussion*

#### A. *Legal Standard*

"In the context of a motion to dismiss for lack of personal jurisdiction in which no evidentiary hearing is held, the plaintiff bears the burden of establishing a prima facie case of jurisdiction over the movant, non-resident defendant." *Morris v. SSE, Inc.,* 843 F.2d 489, 492 (11th Cir.1998). This standard is satisfied "if the plaintiff presents enough evidence to withstand a motion for directed verdict." *Madara v. Hall,* 916 F.2d 1510, 1514 (11th Cir.1990). A party presents enough evidence to withstand a motion for directed verdict by putting forth "substantial evidence ... of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions ...." *Walker v. NationsBank of Fla. NA.,* 53 F.3d 1548, 1554 (11th Cir.1995). In making this determination, the court must construe the allegations in the complaint as true to the extent

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 39
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 39 of 41

**Web.com, Inc. v. Go Daddy Group, Inc., Not Reported in F.Supp.2d (2007)**

that they are not controverted by the defendant. *See Morris,* 843 F.2d at 492.

**B. *Analysis***

***2** The parties agree that in patent cases, Federal Circuit law applies to the determination of personal jurisdiction. *See 3d Sys. ., Inc. v. Aarotech Labs., Inc.,* 160 F.3d 1373, 1377 (Fed.Cir.1998). The analysis of personal jurisdiction involves a two-step process: (1) whether Georgia's long-arm statute authorizes the exercise of personal jurisdiction; and (2) whether the exercise of personal jurisdiction is consistent with due process. *See Pennington Seed, Inc. v. Produce Exch. No. 299,* 457 F.3d 1334, 1343–44 (Fed.Cir.2006). Because Georgia's long-arm statute confers jurisdiction to the maximum extent permitted by due process, these inquiries collapse into one: whether exercising personal jurisdiction over Go Daddy comports with due process. *See Barton S. Co. v. Manhole Barrier Sys., Inc.,* 318 F.Supp.2d 1174, 1176 (N.D.Ga.2004).

Federal courts recognize two types of personal jurisdiction that satisfy due process: general and specific jurisdiction. General jurisdiction may exist when a defendant maintains "continuous and systematic" contacts with the forum state even when those contacts are unrelated to the plaintiff's cause of action. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–15, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.,* 395 F.3d 1275, 1279 (Fed.2005). By contrast, specific jurisdiction exists when a non-resident defendant purposefully establishes minimum contacts with the forum state, the cause of action is related to those contacts, and the exercise of jurisdiction is constitutionally reasonable. *See Burger King v. Rudzewicz,* 471 U.S. 462, 472, 476–77, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

After careful review, the Court finds that Web.com has failed to establish that Go Daddy is subject to either general jurisdiction or specific jurisdiction in Georgia.

As for general jurisdiction, the Court readily concludes that Go Daddy's contacts with Georgia are not continuous and systematic. Indeed, Web.com all but concedes that general jurisdiction is lacking, as it relegates the issue to a footnote in its brief and it does not expressly contend that Go Daddy's contacts with Georgia are continuous and systematic.

Web.com's perfunctory treatment of the general jurisdiction issue is for good reason. As explained earlier, Go Daddy does

not maintain and has never maintained any offices, facilities, employees, or equipment in Georgia, Additionally, Go Daddy does not hold any financial accounts in Georgia, nor is it obligated to pay any taxes in Georgia.

It is true that approximately three percent of Go Daddy's customers reside in Georgia. However, merely doing business with a limited number of Georgia customers is insufficient to demonstrate continuous and systematic contacts. *Accord Stairmaster Sports/Med. Prods., Inc. v. Pac. Fitness Corp.,* 916 F.Supp. 1049, 1053 (W.D.Wash.1994), *aff'd* 78 F.3d 602 (Fed.Cir.1996) (defendant whose sales in forum constituted approximately three percent of its total sales volume did not have continuous and systematic with forum); *McGill v. Giantex Tech. Co.,* No. 05C5892, 2005 WL 3436403, at *3 (N.D.Ill.Dec.12, 2005) (three and a half percent of total sales insufficient to warrant finding of general jurisdiction).

***3** Furthermore, general jurisdiction based upon Go Daddy's maintenance of its website would be improper. *Accord ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,* 293 F.3d 707, 715 (4th Cir.2002) ("We are not prepared at this time to recognize that a State may obtain general jurisdiction over out-of-state persons who regularly and systematically transmit electronic signals into the State via the Internet based solely on those transmissions. Something more would have to be demonstrated"); *Molnlycke Health Care AB v. Dumex Med. Surgical Prods. Ltd.,* 64 F.Supp.2d 448, 451 (E.D.Pa.1999) ("the establishment of a website through which customers can order products does not, on its own, suffice to establish general jurisdiction. To hold that the possibility of ordering products from a website establishes general jurisdiction would effectively hold that any corporation with such a website is subject to general jurisdiction in every state").

For these reasons, the Court finds that general jurisdiction over Go Daddy is lacking. The Court acknowledges, however, that the existence of specific jurisdiction is a closer call.

In *Akro Corp. v. Laker,* 45 F.3d 1541, 1545–46 (Fed.Cir.1995), the Federal Circuit outlined the following three-prong minimum contacts test for determining if specific jurisdiction exists: (1) whether the defendant purposefully directed its activities at residents of the forum; (2) whether the claim arises out of or relates to those activities; and (3) whether assertion of personal jurisdiction is reasonable and fair.

---

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 40
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 40 of 41

Web.com, Inc. v. Go Daddy Group, Inc., Not Reported in F.Supp.2d (2007)

After careful review, the Court finds that Go Daddy has not purposefully directed its activities towards Georgia residents. Web .com fervently argues that Go Daddy has done just that by operating a website that is accessible to Georgia customers. However, merely selling services over the Internet to all potential visitors is not an action purposefully directed at Georgia. *See Trintec Indus., Inc.,* 395 F.3d at 1281 (stating that "the 'ability of District residents to access the defendants' websites ... does not by itself show any persistent course of conduct by the defendants in the District' ") (citation omitted); *Shamsuddin v. Vitamin Research Prods.,* 346 F.Supp.2d 804, 813–14 (D.Md.2004) (finding no "substantial connection" with forum when nothing on defendant's website suggests that defendant "intended to target [forum] residents any more than it intended to target residents of other states").

Moreover, Web.com has failed to show that Go Daddy's website is of such a highly-interactive nature that it can somehow be said that Go Daddy has *per se* purposefully directed its activities towards Georgia through the operation of its website. *See Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119, 1124 (W.D.Penn.1997) (explaining that a highly interactive website may subject a defendant to personal jurisdiction).

According to Web.com, even if the above arguments are rejected, there is still ample evidence to support its position that Go Daddy specifically targets Georgia residents. In an effort to support this argument, Web.com relies upon several customer testimonials from Georgia customers that were previously posted on Go Daddy's website but have since been deleted. Web.com suggests that Go Daddy's removal of these customer testimonials was done with an aim to avoid being subject to personal jurisdiction.

*4 Go Daddy offers a more benign explanation for its removal of the testimonials. Go Daddy explains that in connection with a redesign of its website in the fall of 2006, it asked one of its employees, Ms. Barker, to streamline the one hundred or so customer testimonials that had accumulated on the website. Go Daddy submits the affidavit of Ms. Barker, in which she testifies that she deleted customer testimonials without knowledge of this or any other litigation. Ms. Barker also testifies that without any direction from her supervisor, she retained the twenty most compelling and informative customer testimonials. Go Daddy explains that it continues to provide the names and places of residence of customers providing testimonials in order to personalize

the testimonials, not to target or market to residents of any particular state.

In light of this evidence tendered by Go Daddy, the Court finds no merit in Web.com's argument that personal jurisdiction exists based upon customer testimonials that are no longer viewable on Go Daddy's website.

Web.com also argues that Go Daddy targets Georgia residents through concerted and ongoing marketing efforts. In an attempt to support this contention, Web.com states that two of its high-level employees who are located in Atlanta, Georgia, received marketing materials from Go Daddy in the mail and through email.

Go Daddy reveals, however, that the materials that these high-level employees received are issued to *all* domain name registrants whose domain names are due for renewal, regardless of their geographic location.

Additionally, Web.com proffers evidence that another Georgia-based employee of Web.com ordered a book from Amazon.com and the package contained several printed advertisements, including a Go Daddy advertisement.

However, Go Daddy states that it contracted with Amazon.com to include advertisements in packages mailed out to customers without regard to the recipients, contents, or destinations of the packages. In other words, Go Daddy explains that it never contracted with Amazon.com or any other party to specifically target Georgia customers.

Finally, Web.com argues that Go Daddy reaches out to Georgia residents through its nationwide advertising campaigns, including its nationally-targeted Super Bowl ads. However, nationwide advertising which is not targeted in any way to the forum state does not subject a defendant to personal jurisdiction. *See Sunbelt Corp. v. Noble, Denton & Assocs. Inc.,* 5 F.3d 28, 33 n. 10 (3d Cir.1993) ("[t]o the extent [defendant] also relies on a single advertisement in a national publication received by its counsel, this is insufficient to establish the requisite contacts"); *Singletary v. B.R.X., Inc.,* 828 F.2d 1135, 1136–37 (5th Cir.1987) ("advertising in national publications is not in itself sufficient to subject a defendant to personal jurisdiction"). Web.com tenders no evidence that any of Go Daddy's national advertising campaigns target Georgia. In the absence of such evidence, these national advertisements are not probative.

Case No. 1:13-cv-01493-PAB-KLM   Document 19-8   filed 07/03/13   USDC Colorado   pg 41
of 41
Case 1:13-cv-01901-JOF   Document 8-7   Filed 07/03/13   Page 41 of 41

Web.com, Inc. v. Go Daddy Group, Inc., Not Reported in F.Supp.2d (2007)

**\*5** At bottom, there is nothing on Go Daddy's website that targets Georgia residents, and there is no evidence that Go Daddy makes an effort to drive Internet traffic specifically from Georgia residents to its website. Moreover, Go Daddy has never advertised in print, electronically, or through other media specifically to Georgia consumers. For all of these reasons, the Court finds that Go Daddy has not purposefully directed its activities at Georgia.

Furthermore, even assuming that Go Daddy has purposefully directed its activities at Georgia residents, personal jurisdiction is lacking for other reasons. In particular, Web.com has failed to demonstrate that the patent infringement claims it seeks to have litigated arise out of or are related to Go Daddy's contacts with Georgia. According to Web.com, Go Daddy sells and delivers its allegedly infringing hosting systems to thousands of Georgia customers. To the contrary, the Court finds that these systems are not offered for sale, sold, or delivered to Go Daddy's customers. While customers may contact Go Daddy via the Internet to request modifications to their accounts that are hosted by Go Daddy, the hosting systems themselves consist of servers, databases, routers, and software that are maintained entirely in Arizona.

As described earlier, Web.com's amended complaint states that certain components of Go Daddy's web hosting system infringe Web.com's patents. Every component identified by Web.com, including the control panel, software, database,

and servers, exists in Arizona and is maintained by Go Daddy in that state. Thus, to the extent that Web-com's patent claims are infringed, they are infringed by Go Daddy in Arizona where Go Daddy's servers and equipment are maintained, not by customers in Georgia.

Finally, the Court finds that the exercise of personal jurisdiction over Go Daddy in this forum would offend traditional notions of fair play and substantial justice. "[A]State does have limited judicial authority over out-of-state persons who use the Internet to contact persons within the State." *ALS Scan, Inc.,* 293 F.3d at 713. Here, Go Daddy's only real connection with Georgia is the limited number of its Georgia customers who connect to Go Daddy's website. Such contacts, which are unrelated to the essence of Web.com's patent claims, are insufficient to support the exercise of personal jurisdiction. [2]

### III. *Conclusion*
For all of these reasons, the Court GRANTS Defendant's motion to dismiss for lack of personal jurisdiction and for improper venue [11]. The Court hereby DIRECTS the CLERK to close this case and transfer it to the United States District Court for the District of Arizona, where the parties both agree that personal jurisdiction lies and venue is proper.

IT IS SO ORDERED.

Footnotes

1    A corporate defendant resides in any district where it is subject to personal jurisdiction. 28 U.S.C. § 1391(c). Accordingly, the venue and personal jurisdiction inquiries in this case are one and the same.

2    Web.com also seeks discovery to support its jurisdictional allegations. Because Web.com has neither made out a prima facie case of personal jurisdiction nor explained what it hopes to show through jurisdictional discovery, the Court rejects Web.com's request.

---

**End of Document**                      © 2013 Thomson Reuters. No claim to original U.S. Government Works.